**George S. COHLMIA, Jr., M.D. and Cardiovascular Surgical Specialists Corp., Plaintiffs,**

v.

**ST. JOHN MEDICAL CENTER, William Howard Allred, M.D. and William Burnett, M.D., Defendants.**

Case No. 05–CV–384–GKF–TLW.

United States District Court, N.D. Oklahoma.

Oct. 26, 2012.

Brad Roberson, Dawn Michelle Goeres, Raymond Thompson Cooper, Pignato Cooper Kolker & Roberson PC, Oklahoma City, OK, Daniel Brent Graves, Graves McClain PLLC, Michael L. Barkett, Barkett Law Firm PLLC, Mary Morrison Barcus, Graves McClain PLLC, Tulsa, OK, for Plaintiffs.

James W. Connor, Jr., Richards & Connor, Jason Lee Glass, Savage Baum Glass & Hart PLLC, William Hayden Spitler, IV, McDonald McCann & Metcalf LLP, Tulsa, OK, Sara R. Lincoln, Womble Carlyle Sandridge & Rice PLLC, Charlotte, NC, for Defendants.

### OPINION AND ORDER

GREGORY K. FRIZZELL, Chief Judge.

Before the court is Magistrate Judge T. Lane Wilson's Report and Recommendation [Dkt. # 536] on the Motion for Attorney Fees [Dkt. # 458] filed by defendants St. John Medical Center, William Howard Allred, M.D. and William Burnett, M.D. (collectively, "St. John"). Magistrate Judge Wilson concluded the claims of plaintiffs George S. Cohlmia, Jr., M.D. and Cardiovascular Surgical Specialists Corp. (collectively, "Cohlmia") were "unreasonable and without foundation at the onset of the case, as discovery developed, and ulti-

mately through the granting of judgment on the merits." [Dkt. # 458 at 25]. He recommended St. John be awarded $732,668.00 in attorney fees as the prevailing party in this action pursuant to the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11113. Cohlmia objected to the Report and Recommendation. [Dkt. # 539].

### I. Standard of Review

The district court must conduct a *de novo* review of the Magistrate Judge's Report and Recommendation. 28 U.S.C. § 636(b)(1); *Northington v. Marin*, 102 F.3d 1564, 1570 (10th Cir.1996) ("De novo review is required after a party makes timely written objections to a magistrate's report. The district court must consider the actual testimony or other evidence in the record and not merely review the magistrate's report and recommendations."). The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 72(b).

### II. Procedural Background of Motion

Following St. John's suspension of his medical privileges, Cohlmia sued St. John and some 18 other defendants, alleging a number of federal and state antitrust and business tort claims. Ultimately, Cohlmia settled with all defendants except St. John. St. John asserted, *inter alia*, an affirmative defense that it was immune under federal law from damages pursuant to the HCQIA, 42 U.S.C. § 11101, *et seq.* St. John also moved for summary judgment on the antitrust and tort claims, arguing they failed for lack of evidentiary support. On February 17, 2009, the court granted St. John's motion for summary judgment on Cohlmia's tortious interference with contract claim, finding plaintiff had presented no evidence of damages. [Dkt. ## 340, 341 at 44–45]. On July 31, 2009,

the court granted St. John's motions for summary judgment on Cohlmia's remaining claims; and on August 3, 2009, it entered judgment in favor of St. John and against Cohlmia. [Dkt. ## 446, 448].

On August 31, 2009, St. John filed its Motion for Attorney Fees totaling $973,601.25.[1] The motion was extensively briefed and the Magistrate Judge conducted several hearings. In a 31–page Report and Recommendation, he reviewed at length the factual background and procedural history of the case, discussed applicable law and scrutinized the fee request and underlying documentation. He determined that St. John was entitled to recover attorney fees under 42 U.S.C. § 11113, but recommended the following reductions:

- $13,000.00 for travel time charged at full hourly rates;
- $20,750.00 for fees for St. John's unsuccessful challenge to a motion to compel filed by plaintiff;
- $8,563.00 for paralegal time spent on coding;
- $2,700.00 (from a total of $4,700.00) for preparation of a joint defense agreement;
- a total of 10 percent ($97,360.13) for inadequately documented billings for in-house and co-counsel communications and for activities not traditionally associated with legal work;
- $2,400.00 for work by summer clerks; and
- another 10 percent ($97,360.13) to eliminate fees not attributed to principal timekeepers and block billing;

[Dkt. # 536 at 27–30]. After these reductions, the Magistrate Judge recommended a total fee award of $732.558.00. [*Id.* at 30]. He recommended St. John's request for leave to file supplemental attorney fees

in its pursuit of an attorney fee award be denied.

In his objection, Cohlmia argues attorney fees are not recoverable under HCQIA because his claims were not frivolous, unreasonable, without foundation or brought in bad faith. He also objected to the attorney fee amount recommended by the Magistrate Judge. [Dkt. # 539].

### III. Material Facts

Cohlmia is a surgeon specializing in cardiovascular, thoracic, vascular, and endovascular surgery. His closely held corporation, Cardiovascular Surgical Specialists Corp. ("CVSS") provides cardiovascular, thoracic, vascular and endovascular surgical care. [# 376, Defendants' Statement of Material Facts, ¶ 1; # 422, Plaintiff's Response to Defendants' Statement, ¶ 1].

St. John is a general acute care hospital in Tulsa. [# 376, Defendants' Statement of Material Facts, ¶ 5; # 422, Plaintiff's Response, ¶ 5].

William Burnett, M.D., who is board certified in internal medicine and cardiovascular diseases, is a former President of SJMC's Medical Staff. Howard Allred, M.D., who specializes in colon and rectal surgery, is the VP of Medical Affairs at SJMC. [Dkt. # 376, Defendants' Statement of Material Facts, ¶ 13; Dkt. # 422, Plaintiff's Response, ¶ 13].

Cohlmia founded CVSS in 1994. Throughout the period relevant to this litigation Cohlmia, through CVSS, provided a variety of surgical services, including cardiovascular surgery, thoracic surgery, vascular surgery and endovascular surgery. [Dkt. # 376, Defendants' Statement of Material Facts, ¶¶ 14, 17; Dkt. # 422, Plaintiff's Response, ¶¶ 14, 17.]

---

1. This amount was comprised of $765,824.00 in fees and expenses of the Doerner, Saunders, Daniel & Anderson law firm and $207,777.50 in fees and expenses of the Richards & Connor law firm.

In excess of 50% of Cohlmia's patient population is Native American. [Dkt. # 376, Defendant's Statement of Material Facts, ¶ 18; Dkt. # 422, Plaintiff's Response, ¶ 18].

Before 2003, Cohlmia performed most of his surgeries (in some years 70–80%) at Hillcrest Hospital. The remainder were performed at St. John, Southcrest and Saint Francis hospitals. [Dkt. # 376, Defendants' Statement of Material Facts, ¶ 19; Dkt. # 422, Plaintiff's Response, ¶ 19].

Until July of 2003, Cohlmia had active medical staff privileges at Hillcrest, St. John, Saint Francis, Southcrest and Tulsa Regional Medical Center. [Dkt. # 376, Defendants' Statement of Material Facts, ¶ 20; # 422, Plaintiffs' Response, ¶ 20].

### Cohlmia's Suspension by St. John

On June 6, 2003, Cohlmia performed thoracotomy surgeries at St. John on two patients diagnosed with lung cancer. During surgery on the first patient, Cohlmia removed one lung and several ribs and collapsed the patient's chest cavity. During surgery on the second patient, Cohlmia attempted to remove a tumor in the lung that had invaded the chest wall. [# 364–1, Exs. 1, 3]. The second patient died seven days later, after a second surgery to repair an air leak in the lung that formed as a complication of the initial surgery. [Dkt. # 364–1, Exs. 1, 4]. The patients are referred to as Patient "H" and Patient "P" respectively.

On June 7, 2003, a St. John nurse advised Dr. Allred, Vice–President of Medical Affairs that there might be a serious problem regarding surgery Dr. Cohlmia had performed the previous day. [Dkt. # 364–2, Ex. 5, Allred Dep. at 6.]. On the same day, Allred reviewed two patients' charts and "became concerned" because he noticed that in his opinion there was inadequate workup of the patients before the operations. [Id. at 8–9]. Allred continued to review the patients' records and monitor their conditions for several days. [Id. at 9].

During this time, Allred talked with several St. John physicians expressing concern regarding the care rendered by Cohlmia to these two patients. [Id.] According to the St. John Medical Center Medical Staff Bylaws, Allred, as VP of Medical Affairs, had the authority to, on his own initiative, summarily suspend any member of the medical staff whenever necessary to "protect the life of any patient(s) or reduce the substantial likelihood of immediate injury or damage to the health and safety of any patient. [Dkt. # 364–2, Ex. 6] Allred testified he wanted to ensure that the review was "fair to Dr. Cohlmia, [that] as much information as possible was collected, assimilated, discussed, and a reasonable fair conclusion was reached." [Dkt. # 364–2, Ex. 5 at 14]. He spoke to a pathologist, a thoracic surgeon, a medical oncologist and a pulmonologist about the incidents. [Id. at 12, 14–15].

Allred then spoke to Dr. John Forrest, President of the St. John Medical Staff, and David Pynn, President of St. John, advising them of a potential problem. [Id. at 14–15]. At a meeting of the Medical Staff Executive Officers on July 7, 2003, attended by Pynn, Allred, Forrest, Burnett and William Morgan, St. John General Counsel, a consensus was reached that Cohlmia's privileges to practice at SJMC should be suspended because Cohlmia's treatment of Patient P and Patient H demonstrated "significant error in clinical judgment" and Cohlmia's continued practice at SJMC posed the potential for harm to patients. [Dkt. # 364–2, Ex. 10, Burnett Dep. at 74–77].

On July 8, 2003, Pynn sent a letter to Cohlmia advising that his privileges had been summarily suspended. [Dkt. # 364–3, Ex. 11]. On the same date, the hospital

cut off Cohlmia's access to the hospital, and Cohlmia requested, in writing, that a hearing be scheduled as quickly as possible. [Dkt. # 364–2, Ex. 5; Allred Dep. at 22; Dkt. # 364–3, Ex. 12].

On July 23, 2003, Karen Callahan, attorney for SJMC, sent a letter via certified mail to Cohlmia and his attorney advising that the requested hearing had been set to commence on August 21, 2003 at 9 a.m., and that former U.S. District Court Judge Thomas R. Brett would be the hearing officer. [Dkt. # 364–3, Ex. 12].

On August 21, 22 and 26, 2003, a confidential hearing took place with each party presenting testimony under oath, exhibits, and making arguments before concluding. The hearing was recorded by a licensed court reporter. During the hearing, seven physicians testified on behalf of Cohlmia and seven physicians testified on behalf of St. John. [Dkt. # 364–1, Ex. 1, Hearing Officer Report; Ex. 4, Transcript of Hearing]. One of Cohlmia's witnesses and three of the medical staff witnesses were expert witnesses. [Id.]. Cohlmia testified at length during the hearing. [Dkt. # 364–1, Ex. 4]. Both Cohlmia and St. John submitted pre-hearing and post-hearing memoranda. [Dkt. # 364–3, Ex. 15; Dkt. # 364–4, Exs. 16–19].

On September 4, 2003, Judge Brett issued his Report, Recommendation and Judgment of Hearing Officer finding that the summary suspension of Cohlmia on July 8, 2003, was "the result of a thorough review, by appropriate St. John multidisciplinary medical staff physician specialists, of the medical records regarding major thoracic surgery procedures performed on June 6, 2003 by Cohlmia." [Dkt. # 364–1, Ex. 1].

Judge Brett found that Cohlmia did not obtain the proper workup, which the standard multidisciplinary approach required, prior to performing the surgery on Patient H. Judge Brett found that had Cohlmia obtained this workup, it would have confirmed that he should not proceed with the surgery. He found that the "evidence established that Dr. Cohlmia's basic premise, "Patients without mediastinal lymphadenopathy ... may proceed to thoracotomy" was flawed because a prior CT scan showed it was probable the patient had mediastinal lymphadenopathy and the patient had shoulder pain which is a symptom of mediastinal lymphadenopathy. Judge Brett further found that Dr. Cohlmia should not have "cavalierly" relied solely on his own interpretation of the CT scan and, at a minimum, should have had a radiologist interpret the CT scan. [Id., Ex. 1, SJHRG 4050, 4051, 4053].

Based on these facts, Judge Brett concluded that Cohlmia "demonstrated a lack of sound medical judgment as a thoracic surgeon when he proceeded with a thoracotomy and resection [on Patient H] without appropriate workup and staging." [Id., SJHRG4053]. The surgery that occurred as a result of this lack of judgment resulted in the patient developing a large air leak, requiring emergency surgery which the patient did not survive. [Id., SJHRG4053–54].

With respect to Patient P, Judge Brett found that, based on the evidence presented at the hearing, Cohlmia also demonstrated "gross deviation in medical judgment" when he removed Patient P's lung and 10 ribs without obtaining the standard workup which would have shown the surgery to be futile and dangerous. [Id., SJHRG4058]. He found that the evidence showed it was medically probable that the small cell carcinoma of the patient's lung could have been pathologically determined preoperatively through standard diagnostic procedures. He found that with such a diagnosis, most doctors would not have proceeded with a thoracotomy. [Id., SJHRG4056–57].

Judge Brett further found that Cohlmia's attempt to justify proceeding to surgery without the standard workup due to the patient's lack of financial resources did not "support the removal of a lung and a 10 rib thoracoplasty, which would have been contraindicated had there been appropriate workup and staging." [*Id.*, SJHRG4057]. Further Judge Brett found that the patient's symptoms of hoarseness and an obvious mass indicated tumor presence on the laryngeal nerve which should be treated by oncology therapy rather than surgery. [*Id.*]

Judge Brett concluded that the more convincing thoracic surgical specialty evidence at the hearing was that neither the pneumonectomy nor the full ten rib thoracoplasty was necessary as appropriate treatment for Patient P's small cell carcinoma with obvious postoperative residual tumor and that oncology therapies, chemotherapy and radiation were appropriate instead of surgery. [*Id.*, SJHRG4058]. This gross lack of judgment led Cohlmia to remove a patient's lung although the removal would not benefit the patient. Once Cohlmia removed the lung, the presence of the tumor that he failed to detect created a new danger for the patient. Cohlmia attempted to cure this error by removing ten ribs and collapsing the patient's chest wall, leaving him deformed. [*Id.*, SJHRG4055, 4058].

Based on the findings regarding Cohlmia's gross lack of medical judgment and the gravity of the resulting surgeries and outcomes, Judge Brett concluded that St. John was "justified for medical reasons in summarily suspending Dr. Cohlmia's medical and surgical privileges pursuant to Article 7.3 and 7.3-1 of the SJMC bylaws 'to protect the life of any patient(s) or to reduce the substantial likelihood of immediate injury or damage to the health or safety of any patient.'" [*Id.*, SJHRG40598–40599].

On September 11, 2003, St. John's Medical Executive Committee ("MEC") reviewed the Report, Recommendation and Judgment by Judge Brett and voted, 13–2, to uphold the suspension of Cohlmia's privileges. [Dkt. # 364–5, Ex. 21, Minutes].

On November 17, 2003, the St. John Board of Directors reviewed the facts relating to Cohlmia's suspension, including a formal memorandum in opposition to suspension that Cohlmia had prepared and submitted to the Board. The Board of Directors voted unanimously to affirm the summary suspension of Cohlmia, ratify the actions taken by officers of the hospital and Medical Staff and accept and approve the Judgment of Judge Brett. [Dkt. # 365–5, Ex. 22].

None of the three cardiovascular/cardiothoracic surgeons on the staff at St. John who could be considered direct competitors of Cohlmia participated in the fact gathering, hearing process, MEC decision or Board decision with respect to Cohlmia's privileges. [Dkt. # 364–1, Ex. 4; Dkt. # 364–2, Ex. 8; Dkt. # 364–5, Exs. 21, 22].

### Cohlmia's Relationship with HMC

In January 2003, HMC retained an expert to conduct a departmental review of its cardiology unit. [Dkt. # 376, Ex. 12, 12/20/02 Letter from Landgarten to Elkins]. The expert conducted the review and, at its conclusion, issued a report critical of certain aspects of the program, including patient selection. [Dkt. # 376, Ex. 13, 1/28/03 Letter from Elkins to Landgarten]. The report prompted HMC to institute a moratorium on certain high-risk cardiovascular surgical procedures—a restriction that applied to all physicians within the department. [Dkt. # 376, Ex. 14, Landgarten Dep. at 87–88]. Once the moratorium was instituted at HMC, Cohlmia shifted a significant percentage of his

practice to St. John. [Dkt. # 376, Ex. 1, Cohlmia Dep. at 205].

On July 18, 2003, upon learning of Cohlmia's summary suspension at St. John, HMC required Cohlmia to conduct and document a comprehensive preoperative patient evaluation and review at its facility. [Dkt. # 376, Ex. 25, 7/18/03 Letter From Marc Milsten to Cohlmia]. Cohlmia continued to operate at Hillcrest from July 2003 until May 2006. [Dkt. # 326, Ex. 1, Cohlmia Dep. at 212].

On March 30, 2004, Cohlmia submitted his application for reappointment to HMC's medical staff. [Dkt. # 376, Ex. 26, Uniform Credentialing Application]. In the course of reviewing Cohlmia's application, HMC initiated both internal and external reviews of certain cases performed by Cohlmia. [Dkt. # 376, Ex. 27, 10/21/04 Letter from Landgarten to Cohlmia]. Based on these reviews, the HMC's Medical Executive Committee ("MEC") recommended that Cohlmia's application be denied. [Id.]. Cohlmia requested and was granted a hearing. At the conclusion of the three-day hearing, the Fair Hearing Committee issued a Report and Recommendation in which it found that some of Cohlmia's cases were substandard, but recommended that such deficiencies be addressed with additional training and continuing oversight. [Dkt. # 376, Ex. 28]. Both Cohlmia and HMC's MEC appealed this determination. [Dkt. # 376, Ex. 29]. Throughout the review process, Cohlmia continued to practice at HMC. On March 10, 2006, the Appellate Review Body recommended that Cohlmia's application for reappointment be denied. [Dkt. # 376, Ex. 30]. On April 28, 2006, HMC's Board of Trustees made a final determination to deny Cohlmia's application for reappointment, and Cohlmia was notified of the decision by letter dated May 1, 2006. [Dkt. # 376, Ex. 32].

In early 2004, Cohlmia did not apply for re-credentialing at Saint Francis Hospital, and in early 2006, he withdrew his application for re-credentialing at Southcrest Hospital. [Dkt. # 376, Ex. 1, Cohlmia Dep. at 427].

### Cohlmia's Efforts to Start HVHT

As of 2009, when St. John's summary judgment motions were decided, eight acute care hospitals in Tulsa offered inpatient acute care services ("City of Tulsa hospitals"). Collectively, these hospitals had 2,134 staffed beds and an occupancy rate of 65%. Of these eight, five (Hillcrest, Saint Francis, St. John, Southcrest and OSU Medical Center) offered cardiovascular surgery services. Until 2007, Saint Francis also operated a stand-alone heart hospital which it owned jointly with physician investors. [Dkt. # 376, Defendants' Statement of Material Facts, ¶ 21; Dkt. # 422, Plaintiff's Response, ¶ 21].

Hospitals derive a substantial amount of revenue from cardiovascular service lines, which have higher profit margins than many services. [Dkt. # 376, Defendants' Statement of Material Facts, ¶ 22; Dkt. # 422, Plaintiff's Response, ¶ 22].

Plaintiffs' and defendants' economic experts agree the relevant geographic market for hospital services includes a substantial portion of northeastern Oklahoma, including Tulsa and Cherokee Counties, where Cohlmia maintains an office and practices surgery. [Dkt. # 376, Ex. 49].

According to the geographic market as defined by plaintiffs' economist expert, Hillcrest and St. John have a market share of 13% and 19.3% respectively. [Dkt. # 376, Defendants' Statement of Material Facts, ¶ 24; Dkt. # 422, Plaintiffs' Response, ¶ 24]. Cohlmia, as of 2009, practiced surgery at TCH (Tahlequah City Hospital), which is a convenient locale for many of his Native American patients. [Dkt. # 376, Defendants' Statement of Ma-

terial Facts, ¶ 25; Dkt. # 422, Plaintiffs' Response, ¶ 25].

Cohlmia testified that he considers cardiovascular surgeons, interventionalists, interventional radiologists, cardiologist, and in some instance, general surgeons, to be his competitors. Cohlmia also stated that he competes with those cardiovascular and thoracic surgeons in Tulsa, Fort Smith, Joplin and to a lesser extent, Oklahoma City, and with vascular surgeons and interventional radiologists in a multistate area, including Tulsa, Fort Smith and Joplin. [Dkt. # 376, Ex. 1, Cohlmia Dep. at 34–37].

Patient origin data confirm a regional market for the surgical services that Cohlmia provides, which includes the vast majority of Tulsa County, most of Creek, Mayes, Okmulgee, Rogers and Wagoner Counties, and sizeable portions of 12 other counties (including Cherokee County, where Tahlequah City Hospital is located and where Cohlmia currently practices. [Dkt. # 376, Ex. 2, McCarthy Report, ¶ 42].

Cohlmia testified he competes with Tulsa physicians in all categories of services he provides. [Dkt. # 376, Ex. 1, Cohlmia Dep., 33–37].

As of 2009, there were eight cardiovascular surgery physician groups in Tulsa, with a total of 16 surgeons. The groups range in size from one to three surgeons. Surgery groups in Tulsa have a history of joining together, then breaking apart. [Dkt. # 376, Ex. 2, McCarthy Report, ¶ 27]. Approximately 14 new cardiovascular surgeons entered the northeastern Oklahoma market between 1994 and 2008. [*Id.*, McCarthy Report, ¶ 13].

In the spring of 2001, Cohlmia began to explore the possibility of developing a specialty heart hospital. To this end, he retained a consulting group, Technology Risk Management Group, Inc. ("TRMG"). Cohlmia, his consultants and his attorneys (the "Development Team"), initially explored an affiliation with HMC, but ultimately concluded an affiliation with HMC would be infeasible and shifted its focus to developing a physician-owned free-standing hospital, to be known as Heart and Vascular Hospital of Tulsa ("HVHT"). The Development Team hoped to have HVHT in operation by January or February of 2004. [Dkt. # 376, Defendants' Statement of Material Facts, ¶¶ 40–41; Dkt. # 422, Plaintiffs' Response, ¶¶ 40–41].

Once the decision was made to pursue a free-standing heart hospital, CVH Investments, LLC, an entity owned by Dennis Cohlmia and Bryan Rayment, obtained an option on a parcel of real estate for its site. [Dkt. # 376, Defendants' Statement of Material Facts, ¶ 42; Dkt. # 422, Plaintiffs' Response, ¶ 42].

The establishment of HVHT depended on securing adequate financing from private investors or other sources. [Dkt. # 376, Defendants' Statement of Material Facts, ¶ 43, Dkt. # 422, Plaintiffs' Response, ¶ 43].

In August 2001, the Development Team met with cardiovascular surgeons in Tulsa to present their business plan and gauge their interest as potential investors. In September 2001, similar presentations were made to various cardiology groups in Tulsa, including the cardiology groups who practiced at SJMC and Hillcrest, as well as Springer Clinic. [Dkt. # 376, Defendants' Statement of Material Facts, ¶ 44; Plaintiffs' Response, ¶ 44].

On February 14, 2002, Saint Francis announced its plans to open its own free-standing heart hospital, which would operate as a joint venture between Saint Francis and local cardiologists and cardiac surgeons and investors. Many of these physician investors had previously been solicited by the Development Team. [Dkt. # 376, Ex. 1, Cohlmia Dep. at 45].

In April 2002, the Development Team distributed a Private Placement Memorandum ("PPM") setting out the business plan, pro forma financial projections, investment terms, etc. According to the PPM, HVHT needed capital contributions in the amount of $4.5 million to "commence business." The PPM also noted that HVHT would operate in the "Tulsa market," a geographic area encompassing 17 counties in Oklahoma, including Cherokee County. By the terms of the PPM, investors seeking to purchase units of HVHT had until April 30, 2002, to submit a subscription. The PPG acknowledged that Saint Francis' heart hospital "will have significant competitive advantages over HVHT," including greater capital resources. [Dkt. # 376, Defendants' Statement of Material Facts, ¶¶ 46–50; Dkt. # 422, Plaintiffs' Response, ¶¶ 46–50].

In late April 2002, members of the Development Team met with cardiologists from Oklahoma Heart, Inc., to discuss the PPM and the possibility of investing in HVHT. [Dkt. # 376, Ex. 1, Cohlmia Dep. at 320]. The meetings and presentations by the Development Team failed to enlist a single investor for HVHT. [Dkt. # 376, Ex. 7, Ruffino Affid., ¶ 28]. On May 31, 2002, the PPM expired, with no subscriptions, and was never renewed. [Dkt. # 376, Ex. 8, Riddle Dep. at 253]. By August 2002, a commercial dispute among members of TRMG had resulted in litigation brought by one member of TRMG against TRMG and other members. [Dkt. # 376, Ex. 7, Ruffino Affid., ¶ 27]. By December 2002, Cohlmia had terminated his relationship with TRMG, thus ending efforts to develop HVHT in accordance with the business plan set forth in PPM. [Dkt. # 376, Ex. 7, Ruffino Affid., ¶ 28]. Accordingly, HVHT never progressed beyond the preliminary planning stage.

Development Team members have given a variety of reasons why HVHT failed, none of which relate to defendants' conduct. First, prospective investors were not comfortable with the structure of HVHT and the degree of control Cohlmia would have; Cohlmia had a long history of ending business relationships in litigation, a fact that was widely known by the local medical community; therefore, potential physician investors were hesitant to invest in a venture that gave Cohlmia significant power. [Dkt. # 376, Ex. 7, Ruffino Affid., ¶ 19]. Second, Saint Francis effectively beat the Development Team to the market, greatly reducing the field of potential physician investors and raising significant doubts that Tulsa could support multiple specialty heart hospitals. [*Id.*, Ruffino Affid., ¶ 30(ii)]. Third, in-fighting among principals at TRMG (which resulted in litigation) further impaired the Development Team's efforts to move HVHT beyond an initial planning stage. [*Id.*, Ruffino Affid., ¶ 30(iii)].

Thus, by June of 2002, the HVHT project was essentially "dead." [Dkt. # 376, Ronning Affidavit, Ex. 9, ¶ 21].

In May of 2003, Cohlmia met with cardiologists in Muskogee, cardiologists from Fort Smith and physicians from Wichita in a renewed attempt to secure investors for a heart hospital. He secured no investors. [*Id.*, Defendants' Statement, ¶ 60; Plaintiffs' Response, ¶ 60].

In June 2003, the contract for purchase of the proposed site for HVHT was terminated. [Dkt. # 425, Ex. 28, 6/19/03 Letter from Jay Helm to Brian Rayment].

St. John suspended Cohlmia's privileges on July 7, 2003.

On December 8, 2003, then-President George W. Bush signed into law a statute prohibiting physicians from referring Medicare patients to new specialty hospitals, including heart hospitals, in which they had a financial interest. The statute

effectively imposed a moratorium on the development of new specialty heart hospitals that were not already "under development" as of November 18, 2003. *See Medicare Prescription Drug Improvement and Modernization Act of 2003,* PL No. 108–173, § 507, 42 U.S.C. § 1395nn. [*Id.,* Defendants' Statement, ¶ 62]. In order for a specialty heart hospital to have been deemed "under development," and thus not subject to the moratorium, all of the following preconditions must have been met by 11/18/03: (1) architectural plans must have been completed; (2) funding must have been obtained; (3) zoning requirements must have been met and (4) necessary approvals from state agencies must have been received. [*Id.,* 42 U.S.C. § 1395nn]. As of November 2003, HVHT had no committed financing in place and the real estate option for the HVHT site had lapsed. [*Id.,* Defendants' Statement, ¶ 63].

## IV. Procedural History of Lawsuit

Cohlmia filed suit against St. John and some 18 other defendants on July 7, 2005. [Dkt. # 2]. He filed a First Amended Complaint on September 2, 2005 [Dkt. # 43]. In his 66-page First Amended Complaint, Cohlmia asserted nine causes of action against St. John and other defendants:

> Count I—Combination and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;
>
> Count II—Violation of Section 2 of the Sherman Act and Section 4 of the Clayton Act;
>
> Count III—Illegal boycott/concerted refusal to deal;
>
> Count IV—Violation of 79 Okla.Stat. § 202 *et seq.* (Oklahoma Antitrust Reform Act);
>
> Count V—Tortious interference with contract and prospective advantage;

> Count VI—Defamation-libel, libel per se, slander, slander per se;
>
> Count VII—Violation of 42 U.S.C. § 1981;
>
> Count VIII—Intentional infliction of emotional distress;
>
> Count IX—Injunctive relief (reinstating plaintiff to full privileged status of the medical staffs of St. John and Hillcrest Medical Center);

[Dkt. # 43]. Defendants, including St. John, filed motions to dismiss Counts I–VIII. [Dkt. ## 61–64]. On August 2, 2006, United States District Judge James H. Payne entered a 30-page order ruling on defendants' motions to dismiss. [Dkt. # 83]. In Count I, Cohlmia asserted St. John abused the peer review process in order to prevent Cohlmia's development of a specialty heart hospital and to impede his existing practice. St. John, in its motion to dismiss, argued the ouster of one physician and the resulting harm to his practice did not equate to harm to competition, but merely harm to that competitor. The court acknowledged this, but concluded that "at this early stage of litigation … the Court finds that Plaintiffs have alleged sufficient facts to survive dismissal of the Section 1 (and corresponding state law) claim." [Dkt. # 83 at 12.]

With respect to Count II and the corresponding state law claim, the complaint alleged that by terminating his medical staff privileges, St. John "posed a dangerous likelihood of success" of obtaining monopoly power over the cardiovascular market. Judge Payne found that Cohlmia failed to support this conclusory allegation with any facts, and dismissed the claim without prejudice. [*Id.* at 14].

With respect to Count III, the boycott claim, the court found the alleged conduct of defendants did not constitute a per se violation of antitrust law. Applying the rule of reason test, the court ruled that

Cohlmia had failed to allege facts showing some anticompetitive effect. [*Id.* at 17–18]. Therefore, Count III was dismissed with prejudice.

The court dismissed with prejudice Cohlmia's claim for defamation as to any statement made outside the statute of limitations, and dismissed without prejudice all other purported defamation as being insufficiently clear with respect to the relationships between the parties involved in the communications, the timing of the communications, and/or the statements deemed actionable. [*Id.* at 21].

Count VII alleged St. John's suspension of Cohlmia's privileges was motivated in part by an unlawful desire to deprive Native American patients of cardiothoracic surgical services at St. John by eliminating Cohlmia as their preferred physician. Cohlmia asserted that St. John's actions were motivated by a concern that his uninsured native American patients were costing the hospital money. He alleged Native Americans were unlawfully discriminated against and were part of a protected class and he asserted he was their *de facto* representative and advocate of their right to quality health care. [*Id.* at 21–22]. Judge Payne found these allegations to be "largely unsupported, if not nonsensical," and dismissed the claim without prejudice. [*Id.* at 22, 24].

Judge Payne dismissed with prejudice Cohlmia's IIED claim (Count VIII) for failure to allege facts sufficient to support the elements of such a claim. [*Id.* at 24–25].

Judge Payne also determined the peer review privilege was not applicable in the action, and that discovery could proceed unfettered. [*Id.* at 29]. He gave Cohlmia leave to file an amended complaint addressing deficiencies the court had identified in its order. [*Id.* at 29–30].

On October 10, 2006, Cohlmia filed a 76-page Second Amended Complaint, alleging additional facts supporting his previously pled complaints. [Dkt. # 90]. Although Judge Payne had dismissed several of the claims with prejudice, Cohlmia continued to plead those claims.

On November 9, 2006, St. John filed its second Motion to Dismiss. [Dkt. # 103]. On March 20, 2007, the case was reassigned to the undersigned judge. [Dkt. # 119]. On May 31, 2007, this court conducted a hearing on the motion. [Dkt. # 121]. During the hearing, the court questioned counsel for Cohlmia about why Cohlmia had reasserted claims Judge Payne had dismissed with prejudice. Counsel contended the claims had been reasserted in order to preserve them for appeal, but agreed to withdraw Count III with respect to St. John. [Dkt. # 125 at 10–15]. The court found the antitrust claims should be addressed on summary adjudication, but expressed concern about the viability of the claims, stating that, based on the number of hospitals in Tulsa, plaintiffs faced "serious hurdles" to survive summary judgment. [*Id.* at 11].

The court granted St. John's motion with respect to Count III (illegal boycott) and Count VI (defamation), found the motion to dismiss Count VIII (IIED) was moot because Judge Payne had already dismissed it with prejudice, and denied the motion with respect to Count VII (§ 1981 claim). [*Id.* at 15, 18, 21]. The court directed, however, that discovery on the Section 1981 claim be limited to the issue of whether St. John shut its door on Native Americans. [*Id.* at 29]. After more than a year-and-a-half in which to conduct such discovery, plaintiffs dismissed their Section 1981 claim on January 22, 2009. [Dkt. # 334].

On May 31, 2007, the court also entered a scheduling order, setting discovery cutoff for July 15, 2008, and a trial date of March 16, 2009. [Dkt. # 122]. On July 16, 2007,

St. John filed an answer asserting the affirmative defense of immunity under the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. § 11111(a)(1). [Dkt. # 130 at 20]. On March 27, 2008, the court granted plaintiffs' motion for an extension of scheduling order deadlines, setting discovery cutoff for September 15, 2008, and trial for May 18, 2009. [Dkt. # 154–1]. By March 2008, defendants had produced over 30,000 documents, and by August 2008, over 150,000, but Cohlmia— complaining that defendants had "stone-wall[ed]" him "on the most critical information in this case"—filed opposed motions to extend the discovery deadline yet again. [Dkt. # 205 at 6; Dkt. # 246]. The court entered a second amended scheduling order extending discovery to February 19, 2009, and setting a new trial date of October 19, 2009. [Dkt. # 301].

On August 22, 2008, 254 F.R.D. 426 (N.D.Okla.2008), the reports offered by three of Cohlmia's expert witnesses were stricken by Magistrate Judge Paul J. Cleary for failure to comply with Rule 26(a)(2). Magistrate Judge Cleary concluded that the reports contained the experts' opinions but failed to state the basis or reasons for the opinions. [Dkt. # 210 at 5, 14]. The Magistrate Judge denied Cohlmia's request to allow up to 30 days before trial to cure the deficiencies, stating, "A party cannot offer a mere litany of opinions, devoid of rationale, and contend that the report will be 'supplemented' later with the basis and reasons." [Id. at 11]. He also denied Cohlmia's alternative request for 20 days to supplement the reports, pointing out the case had been on file for three years and further extensions would increase the cost of litigation for all parties. [Id. at 12]. This court denied Cohlmia's appeal of the Magistrate Judge's order. [Dkt. # 262].

St. John filed its first motion for summary judgment on November 7, 2008. [Dkt. # 279]. At the conclusion of a hearing on February 12, 2009, the court granted St. John's motion for summary judgment as to Count VII (tortious interference with contract). [Dkt. # 340]. In so ruling, the court noted Cohlmia had failed to properly support his assertion of disputed material facts as required by Fed.R.Civ.P. 54(f), and declined to grant the oral request of plaintiff's attorney for additional time to present such facts. [Dkt. # 341 at 44]. Rejecting Cohlmia's argument that damages should be presumed, it found Cohlmia had failed to present evidence of damage proximately caused by St. John's suspension of his privileges. [Id. at 44–45]. Cohlmia filed a motion to reconsider, and the motion was denied. [Dkt. ## 347, 401].

On April 3, 2009, St. John filed a motion for summary judgment on plaintiff's federal and state antitrust claims for restraint of trade and market monopoly. [Dkt. # 363]. St. John argued it was entitled to immunity from these claims under HCQIA because its peer review process complied with the four objective standards in 42 U.S.C. § 11112(a). [Id.].

On April 7, 2009, all defendants, including St. John, filed a joint motion for summary judgment addressing the merits of plaintiff's federal and state antitrust claims as set forth in Counts I, II, III and IV of the Second Amended Complaint. [Dkt. # 376].

With respect to its HCQIA immunity motion, St. John focused on: (1) the deposition testimony of physicians and surgeons and excerpts from transcripts of the peer review process showing that Cohlmia's pre-surgical protocol departed from the proper standards of care; (2) St. John suspended Cohlmia to protect the safety of patients; and (3) St. John's peer review process complied with the requirements of HCQIA. [Dkt. # 451 at 15–41, 70–74].

Cohlmia focused on: (1) a June 26, 2003 memo from Dr. Allred; (2) a comparison of Cohlmia's Quality Assurance scores with other surgeons; (3) The Tenth Circuit's holding in *Brown v. Presbyterian Health-care Services*, 101 F.3d 1324 (10th Cir. 1996); (4) the timing of Cohlmia's interest in a specialty heart hospital and St. John's termination of his privileges; (5) plaintiffs' expert opinion that St. John's peer review process was "unwarranted, unfair, unreasonable, incomplete, misleading, inaccurate" and involved false testimony; (6) a St. John official notifying a Hillcrest official that Cohlmia's privileges at St. John were summarily suspended; (7) the availability of less severe options to address Cohlmia's pre-surgical protocol; and (8) Cohlmia's performance of 34 unchallenged surgeries following the two surgeries at issue. [Dkt. # 451 at 42–69].

With respect to the antitrust claims, St. John argued (1) plaintiffs did not have standing; (2) the Section 1 claims failed for lack of a showing of concerted action and market power; and (3) the Section 2 claims failed for lack of showing that St. John posed a "dangerous probability" of achieving market power. [*Id.* at 70–95; 110–119]. Cohlmia argued St. John's actions had the following anticompetitive effects: (1) the "diminution of quality" of a patient's choice of surgeons and denial of services to Native Americans; (2) the "retardation of innovation" as specialty heart hospitals are more productive and provide better care; and (3) St. John's sham peer review process. [*Id.* at 95–110].

At the conclusion of the hearing, the court granted both motions for summary judgment. The court found that with respect to the HCQIA immunity defense plaintiffs had failed to rebut the presumption of immunity by a preponderance of the evidence. [*Id.* at 125]. The court distinguished the facts of this case from *Brown*, noting that in *Brown*, the evidence

of ulterior motive was direct: an economic competitor had instigated the review, made false statements about the plaintiff to the National Practitioner Database, and testified against her in peer review proceedings. [*Id.*]. In this case, in contrast, the evidence of ulterior motive was inferential. [*Id.*]. With respect to the antitrust claims, the court concluded plaintiffs had presented no evidence of antitrust injury, no evidence of injury in fact to Cohlmia, and no causal connection between the failure of Cohlmia's heart hospital project and St. John's termination of his privileges. [*Id.* at 122]. As to the alleged concerted action, the court found Cohlmia had failed to show a contract or conspiracy between separate entities, and concluded that Section 1 of the Sherman Act does not reach conduct which is wholly unilateral. [*Id.* at 123]. Further, the court found Cohlmia had presented "no evidence of actual anti-competitive effects" attributable to St. John's conduct. [*Id.* at 124].

With respect to possession of market power, the court held that St. John's 19.3 percent market share was not sufficient to confer market power. [*Id.*]. As to Section 2 of the Sherman Act, the court found Cohlmia had presented no evidence that St. John had the power to control prices of any market in which it competed. [*Id.* at 125].

Regarding the Oklahoma Antitrust Act, the court applied the mandatory provision of the state act that it shall be construed consistent with the federal act. [*Id.*]. The court held that the essential facilities doctrine of state law was inapplicable because of the number of facilities in the Tulsa market area at the relevant time. [*Id.*]. The court granted St. John's motion for summary judgment on the antitrust claims. [*Id.*].

On September 7, 2012, the Tenth Circuit affirmed the district court's grant of sum-

mary judgment on all claims of Cohlmia. [Dkt. # 543]. In so ruling, the appellate court concluded that with respect to the HCQIA issue, Cohlmia had not rebutted the presumption that a professional review action is presumed to have met standards for HCQIA immunity. [*Id.* at 15]. Concerning the federal antitrust claims, the circuit court agreed that Cohlmia had presented no evidence his loss of privileges resulted in antitrust injury; that Cohlmia had not demonstrated St. John had sufficient market power to control prices or exclude competition; and that Cohlmia had failed to produce evidence of conspiracy. [*Id.* at 22, 26]. With respect to the state antitrust claims, the Tenth Circuit concurred with the district court's finding that Cohlmia had provided no evidence that St. John violated state antitrust law or specifically, the "essential facility doctrine." [*Id.* at 28]. It affirmed the court's grant of summary judgment on Cohlmia's claims for tortious interference with contracts and intentional interference with prospective economic advantage. [*Id.* at 32, 34]. The appellate court rejected Cohlmia's argument that the district court erred in denying his request to submit an expert report detailing his damage, concluding "[i]t was not an abuse of discretion for the district court to reject Dr. Cohlmia's filing based on his failure to comply with Rule 56(f). [*Id.* at 31]. Similarly, it rejected Cohlmia's argument that the district court erred in overruling his motions to supplement the record because he had failed to comply with required procedures for submission. [*Id.* at 34–35]. Finally, it affirmed the district court's award of costs to St. John. [*Id.* at 35–37].

## V. Law Applicable to Attorney Fee Claim

■ Congress enacted HCQIA to improve the quality of medical care by promoting effective professional peer review. 42 U.S.C. § 11101(1), (3). The law protects participants in peer review activities from liability for damages stemming from a review, so long as the review satisfies standards set out in 42 U.S.C. § 11112. HCQIA provides that a prevailing defendant is entitled to recover attorney fees as follows:

> In any suit brought against a defendant, to the extent that a defendant has met the standards set forth under section 11112(a) of this title and the defendant substantially prevails, the court shall, at the conclusion of the action, award to a substantially prevailing party defending against such claim the cost of the suit attributable to such claim, including a reasonable attorney's fee, if the claim, or the claimant's conduct during the litigation of the claim, was frivolous, unreasonable, without foundation, or in bad faith. For the purposes of this section, a defendant shall not be considered to have substantially prevailed when the plaintiff obtains an award for damages or permanent injunctive or declaratory relief.

42 U.S.C. § 11113. Prevailing defendants are entitled to an award of attorney fees in defending against an unsuccessful challenge to their HCQIA immunity if: (1) they are among the persons covered by § 11111; (2) the standards set forth in § 11112(a) were followed; (3) they substantially prevailed; and (4) the plaintiff's conduct during the litigation was frivolous, unreasonable, without foundation or in bad faith. *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 472–73 (6th Cir. 2003). *See also, Addis v. Holy Cross Health System Corp.*, 88 F.3d 482, 486 (7th Cir.1996) (finding the text of § 11113 contemplates an award of fees if, in addition to other factors, a plaintiff's claims are frivolous or otherwise without merit); *Benjamin v. Aroostook Medical Center*, 937 F.Supp. 957 (D.Maine 1996) (HCQUI allows for attorney fees "if either the plaintiff's claim or actions were 'frivolous,

unreasonable, without foundation, or in bad faith'"). The award of attorney fees under § 11113 is a discretionary matter for the district court to determine. *Addis,* 88 F.3d at 486–87. Likewise, whether a party's conduct is frivolous or without foundation is a question committed to the sound discretion of the district court. *Johnson v. Nyack Hospital,* 964 F.2d 116, 123 (2d Cir.1992).

Clearly, the first three requirements for an award of attorney fees have been satisfied. The St. John defendants are among the persons covered by § 11111. The court, in granting St. John's motion for summary judgment as to HCQIA immunity, determined St. John had complied with the requirements of § 11112(a) and had "substantially prevailed" on Cohlmia's claims. The remaining issue for determination is whether Cohlmia's litigation conduct in pursuing those claims was frivolous, unreasonable, without foundation or in bad faith.[2]

## VI. Analysis

### A. Whether St. John is Entitled to Attorney Fees

■ As a threshold matter, Cohlmia argues St. John's entitlement to attorney fees must be evaluated based on the reasonableness of his challenge to St. John's affirmative defense of immunity rather than on the reasonableness of his assertion of the claims themselves.[3] The plain language of the statute contradicts this position. Section 11113 refers to "a substan-

tially prevailing party defending against such *claim*" and provides that party will be entitled to recover for "the cost of the suit attributable to such *claim.*" 42 U.S.C. § 11113 (emphasis added). Further, as the court in *Addis* stated:

> Congress passed the Health Care Act ... to "provide incentive and protection for physicians engaging in effective professional peer review. 42 U.S.C. § 11101(5). These incentives were designed to encourage doctors to engage in meaningful peer review in light of the Health Care Act's imposition of intensified reporting requirements. It was Congress's hope that doctors would comply with the reporting requirements installed by the Health Care Act and thereby decrease the number of occurrences of medical malpractice.

> Important elements of this package of incentives were the creation of statutory immunity for those persons and entities engaged in qualified professional peer review, 42 U.S.C. §§ 1111(a), 11112(a), and a fee-shifting provision designed to deter plaintiffs from filing meritless lawsuits against those persons and entities. 42 U.S.C. § 11113. Thus, "[d]octors and hospitals who have acted in accordance with the reasonable belief, due process, and other requirements of the bill are protected from damages sought by a disciplined doctor." H.R.Rep. No. 99–903, 99th Cong., 2d Sess., at 3 (1986),

**2.** Citing antitrust decisions, Cohlmia argues attorney fees cannot be awarded to defendants in private antitrust litigation. [Dkt. # 539 at 19]. St. John correctly notes that while this proposition may be generally true, it is inapplicable in cases involving a fee statute such as 42 U.S.C. § 11113.

**3.** The Magistrate Judge held that St. John's entitlement to attorney fees was not predicated on whether Cohlmia's challenge to its immunity defense was without foundation, but

instead on whether Cohlmia's claims or his litigation conduct in pursuing those claims were frivolous, unreasonable, without foundation or in bad faith. [Dkt. # 536 at 19]. St. John asserts § 11113 permits recovery of attorney fees on either basis. [Dkt. # 542 at 7, n. 2]. In *Smith v. Ricks,* the court, in granting the defendant hospital's motion for attorney fees, found that both the immunity challenge and the underlying antitrust claims were without foundation and/or frivolous. 31 F.3d 1478, 1487–88 (9th Cir.1994).

*reprinted in* 1986 U.S.C.C.A.N. 6384, 6385.

88 F.3d at 485. Similarly, in *Smith v. Ricks,* the Ninth Circuit stated, "The policy behind [42 U.S.C. § 11113] is clear: Congress wanted to encourage professional peer review by limiting the threat of unreasonable litigation expenses." 31 F.3d at 1487.

In this case, both Cohlmia's challenge to HCQIA immunity and his underlying substantive claims warrant an award of attorney fees to St. John. The court concludes that Cohlmia's claims were—at best—unreasonable and without foundation and—at worst—frivolous and asserted in bad faith. The court finds the defamation and IIED claims, which were disposed of at the motion to dismiss stage, were frivolous when pled. The Section 1981 claim, pursuant to which Cohlmia accused St. John of attempting to "deprive Native Americans of quality health care," survived St. John's motion to dismiss, but after more than a year and one half of discovery, was voluntarily dismissed by plaintiffs. Although the antitrust claims also survived the motion to dismiss, the court early on expressed skepticism of their viability based on the number of hospitals in the Tulsa area. On February 17, 2009, the court granted St. John's motion for summary judgment on the tortious interference with contract claim. Finally, on July 31, 2009, after four years of discovery and motion practice, the court granted St. John summary judgment on the remaining claims, concluding not only that Cohlmia had failed to rebut the presumption of HCQIA immunity, but that he had failed to present evidence supporting the elements of his substantive claims for antitrust violations.

As support for his argument that his claims were reasonable, Cohlmia points to the fact that only St. John prevailed on the merits of his claims; the remaining defendants settled with him. The court rejects this argument. Cohlmia's claims against the St. John defendants were based primarily on the hospital's suspension of his privileges. His claims against the remaining defendants were based on his altercations with Hillcrest Medical Center and Oklahoma Heart Institute. Additionally, as Magistrate Judge Wilson noted in his Report and Recommendation, "[c]ases, even those with no merit, settle for many reasons, including a desire to minimize legal fees and expenses." [Dkt. # 536 at 6, n. 10].

Recounting the volume of evidence he submitted in opposition to St. John's motions for summary judgment, Cohlmia argues his claims were reasonable.[4] Again, the court disagrees. While plaintiffs indeed introduced a massive quantity of evidentiary materials, the court determined they had failed to controvert a single material issue of fact and St. John was entitled to summary judgment, based on both its immunity defense and on the merits of the antitrust claims. Plaintiffs also suggests the length of the summary judgment hearing supports a conclusion that their claims were reasonable. [*Id.*]. Similarly, they note that at the conclusion of the hearing, the court remarked that the "advocacy on both sides here has been extraordinarily good." [*Id.* at 14, referencing Dkt. # 539, Ex. F, 7/31/09 Tr. at 119–20]. The court rejects these arguments, as neither the length of the hearing, nor the advocacy skills of counsel supports a conclusion the claims were reasonable. Plaintiffs asserted and aggressively pursued nine claims

---

**4.** During argument before the Magistrate Judge, counsel for plaintiffs stated that, in response to St. John's summary judgment motion, they had submitted a "plethora of evidence," including 85 alleged "material disputed facts" and 71 exhibits. [Dkt. # 539, Ex. D, 6/3/11 Hearing Tr. at 3, 7].

against St. John. St. John was forced to engage in four years of intensive, time-consuming and costly discovery and motion practice before prevailing on the merits on all claims. As detailed in Section IV above, the court repeatedly dismissed the IIED, boycott and defamation claims; granted summary judgment on the tortious breach of contract claim; and ultimately granted summary judgment on the antitrust claims, finding both that St. John had immunity under § 11113 *and* that Cohlmia failed to present evidence supporting the elements of such claims. The court's rulings were affirmed on appeal.

Plaintiffs cite a number of cases in which defendants successfully asserted HCQIA immunity defenses, but were denied attorney fees: *Muzquiz v. W.A. Foote Memorial Hospital, Inc.*, 70 F.3d 422 (6th Cir. 1995); *Benjamin,* 937 F.Supp. at 963; *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461 (6th Cir.2003), *Stratienko v. Chattanooga–Hamilton County Hosp. Authority*, 2009 WL 1471453, *2, *4 (E.D.Tenn.2009); and *Johnson v. Nyack Hosp.*, 964 F.2d 116 (2d Cir.1992).[5]

■ As the court in *Meyers* noted, "[w]hether a party's claim or conduct is frivolous, unreasonable, without founda-

---

**5.** In *Muzquiz*, the appellate court upheld the district court's determination that the prevailing defendant hospital was not entitled to recover attorney fees because plaintiff's claims were not without foundation. The court found, based on statements made to the doctor, protracted processing of his application for privileges in contrast to the processing of the applications of other doctors who applied at the same time, and the fact that he was the oldest applicant and the only applicant of Mexican heritage, plaintiff had "a legitimate factual basis" for asserting his claims. *Id.* at 432–33. In *Muzquiz*, plaintiff's claims of Title VII discrimination and state civil rights violations actually proceeded to trial. In contrast, Cohlmia's claims were disposed of, at the latest, on summary judgment. In *Benjamin*, a physician, acting pro se, asserted antitrust, Title VII and abuse of process claims against a hospital and staff members who served on its peer review committee. 937 F.Supp. at 963. The court granted defendants' motion for summary judgment on the basis of HCQIA immunity and state law immunity, and additionally found plaintiff had failed to establish the substantive elements of his claims. *Id.* at 968–975. However, the court declined to award attorney fees to defendants, The court did not elaborate on its rationale, other than to note plaintiff's claims were "not wholly without merit." *Id.* at 975. In *Meyers*, a physician sued a hospital that denied him staff privileges, alleging, *inter alia*, breach of contract, antitrust violations, and state tort claims. The federal district judge granted defendants' motion for summary judgment based on HCQIA immunity but denied their motion for attorney fees, concluding that plaintiff "had valid questions concerning the manner in which the [ ] Defendants conducted the professional review." *Id.* at 473. In *Meyers*, the initial review committee was composed of the plaintiff physician's competitors, the review process took more than two years and there was evidence the hospital did not comply with its bylaws. *Id.* at 463–65. The court also observed that the district court never reached the question of whether plaintiffs had sufficient evidence to reach a jury on their claims. *Id.* at 473. In *Stratienko*, a physician challenged a 30–day summary suspension that occurred an hour and a half after a competitor physician reported an altercation in the doctor's lounge. The court dismissed plaintiff's non-antitrust claims and granted summary judgment in favor of defendants on his federal antitrust claims and federal and state constitutional claims based on HCIQ immunity. Relying in part on *Meyers*, however, it denied defendants' motion for attorney fees. In *Johnson*, the district court granted summary judgment against the plaintiff physician on his antitrust and interference with economic advantage claims against a hospital that revoked his privileges because plaintiff failed to comply with a state law requiring him to file a complaint with the state public health council prior to seeking redress in court. However, the court denied defendants' request for attorney fees, finding plaintiff's mistake did not warrant an award of attorney fees. The appellate court affirmed the decision. 964 F.2d at 123–124.

tion, or in bad faith is a question committed to the sound discretion of the district court." 341 F.3d at 473. This court, having shepherded this case through most of its long life, concludes the facts here are distinguishable from the cases relied upon by Cohlmia, and warrant an award of attorney fees.

In this case, St. John engaged in a thorough, open and professional peer review in compliance with its bylaws. Cohlmia was represented by counsel and the proceeding was held before a retired federal district judge, who issued a detailed written opinion which was reviewed and approved by St. John's Executive Committee and Board of Trustees. From the outset, Cohlmia's conduct was unreasonable. In commencing this action, he alleged that peer review process was a sham and conducted in bad faith, was an attempt to "run him out of town" and to "deprive Native Americans of quality health care." He ignored indicators that the case against St. John lacked substance and engaged in extensive, costly discovery. He unreasonably failed to file expert reports that conformed to the Federal Rules of Civil Procedure, and then sought leave to fix those reports.

At the hearing before the Magistrate Judge, Cohlmia argued his claims were not unreasonable or frivolous because the peer review process was tainted with irregularities. Specifically, he complained that no cardiovascular surgeon was asked to review the two surgeries at issue. As the Magistrate Judge pointed out in his Report and Recommendation, in *Brown*—the case principally relied on by plaintiff in arguing the merits of his claim—the Tenth Circuit criticized the fact that a competitor of Dr. Brown testified against her. Here, the use of a cardiovascular surgeon likely would have involved a direct competitor of Cohlmia.

The court concurs with the Magistrate Judge's finding that Cohlmia's claims were "unreasonable and without foundation at the onset of the case, as discovery developed, and ultimately through granting of judgment on the merits four years later." [Dkt. # 458 at 25]. As a result, St. John is entitled to recover attorney fees under the HCQIA, 42 U.S.C. § 11113.

## B. Reasonableness of Fees Sought

Cohlmia also challenges the reasonableness of the amount of the recommended fee award. First, he asserts the Magistrate Judge should have apportioned the fee award among specific claims made by Cohlmia, and no attorney fee should have been awarded for claims dismissed early and/or by stipulation of the parties. Cohlmia cites no authority for this proposition.

Additionally, he complains that the Report and Recommendation did not comport with earlier views the Magistrate Judge expressed in an October 13, 2010, telephonic hearing. This objection is meritless. In the October 2010 hearing, the judge simply conveyed a preliminary opinion regarding the attorney fee issue, and heard argument from the parties. Subsequently, the Magistrate Judge gave St. John an opportunity to supplement its attorney fee motion, allowed Cohlmia to respond to the supplemental motion, and conducted additional hearings on the motion on April 28, 2011, and May 24, 2011. [Dkt. ## 518, 529, 531, 533]. Cohlmia's claim that the Magistrate Judge's considerations were "unfair" and "unjust" is groundless.

The court, having reviewed the amount of the fee award, concurs with the Magistrate Judge's recommendations as to reductions and the total fee.

## VII. Conclusion

For the foregoing reasons, the Report and Recommendation of the Magistrate Judge [Dkt. # 536] is accepted and St. John's Motion for Attorney Fees [Dkt.

# 458] is granted in the amount of $732,558.00.

## REPORT AND RECOMMENDATION

T. LANE WILSON, United States Magistrate Judge.

This matter has been referred to the undersigned for a report and recommendation on the motion for attorney fees filed by defendants St. John Medical Center, William Howard Allred, M.D., and William Burnett, M.D.[1] (these defendants are hereinafter referred to in the singular as "St. John"). [Dkt. ## 458, 460, 486]. The following represents the undersigned's Report and Recommendation.[2]

### Background

Plaintiff, George S. Cohlmia, Jr. is a licensed physician in the State of Oklahoma. He has specialized in cardiovascular, thoracic, vascular and endovascular surgery in Tulsa since 1984. Dr. Cohlmia is the sole owner and shareholder of Cardiovascular Surgical Specialists, Inc. (hereinafter referred to in the singular as "Dr. Cohlmia"). [Dkt. # 90 at 2, 7]. Dr. Cohlmia received his board certification in surgery in 1986, and his board certification in

thoracic surgery in 1987. Dr. Cohlmia has performed thousands of surgeries in Tulsa. A significant percentage of Dr. Cohlmia's patients are uninsured or under-insured Native Americans. [Dkt. # 90 at 7, 8 and Dkt. # 376 at 5]. Native Americans have traditionally accounted for greater than fifty percent (50%) of Dr. Cohlmia's patient base. [Dkt. # 376 at 21].

On August 3, 2009, the District Court entered judgment in this case in favor of St. John and against Dr. Cohlmia. [Dkt. # 448]. On August 31, 2009, St. John timely filed its application for attorney fees as prevailing party. [Dkt. # 458]. In support of its application, St. John relies on the Statement of Undisputed Facts and attached supporting materials from its Brief in Support of Motion for Summary Judgment filed on April 7, 2009.[3] [Dkt. ## 364, 458]. The following is a brief summary of relevant facts from St. John's brief.

Until July 2003, Dr. Cohlmia had active medical staff privileges at all five major hospitals in Tulsa.[4] Prior to 2003, Dr. Cohlmia performed most of his surgeries at Hillcrest Medical Center ("Hillcrest").

---

1. Dr. Allred is the Vice President of Medical Affairs for St. John and is a surgeon specializing in colon and rectal surgery. Dr. Burnett is a former President of St. John's Medical Staff and is board certified in internal medicine. Dr. Allred and Dr. Burnett participated in St. John's decision to terminate Dr. Cohlmia's medical staff privileges, the incident giving rise to this lawsuit. [Dkt. # 376 at 4]. St. John Medical Center paid Dr. Allred's and Dr. Burnett's attorney fees and expenses arising out of this lawsuit.

2. On October 31, 2010, during a telephone conference the undersigned advised counsel that his report was prepared and that he intended to recommend an award of attorney fees incurred as a result of plaintiff's claims under Section I and probably under Section II of the Sherman Act, and deny attorney fees incurred on St. John's affirmative defense of immunity under the Health Care Quality Im-

provement Act, on plaintiff's state law claims for Tortious Interference with Contract, and the Oklahoma Antitrust Act. [Dkt. # 529, Ex. A.]. Counsel was instructed to file supplemental briefs to address apportionment between these claims and defenses. Subsequently, the undersigned re-examined the pleadings, exhibits, arguments of counsel, and relevant federal law, and based on that review, has reconsidered some aspects of the recommendation.

3. On August 27, 2009, Judge Frizzell announced from the bench his decision on St. John's Motion for Summary Judgment and specifically found that there were no genuine issues of material fact which would preclude summary adjudication given the standard in 42 U.S.C. § 11112(a). [Dkt. # 451 at 120].

4. Hillcrest Medical Center, Saint Francis Hospital, SouthCrest Hospital, Tulsa Regional Hospital and St. John Medical Center.

[Dkt. # 376 at 5]. In the spring of 2001, Dr. Cohlmia began to explore the possibility of developing a physician-owned speciality heart hospital. Dr. Cohlmia hired a consulting firm and obtained an option on real estate. Dr. Cohlmia and his consultant first considered an affiliation with Hillcrest, but determined it was infeasible. [Dkt. # 376 at 9]. Dr. Cohlmia's business plan was presented to various cardiovascular surgeons in Tulsa, including the cardiology groups who practice at St. John and Hillcrest. [Dkt. # 376 at 9–10]. In February 2002, Saint Francis Hospital announced plans to open a speciality heart hospital, as a joint venture with local cardiologists and surgeons. [Dkt. # 376 at 10]. In December 2002, Dr. Cohlmia terminated his arrangement with his consultant, and by June 2002 his project was essentially dead. In April or May 2003, Dr. Cohlmia presented his business plan to cardiologists in Muskogee, Oklahoma; Fort Smith, Arkansas; and physicians in Wichita, Kansas. He did not secure an investor through these efforts. [Dkt. # 376 at 12]. In June 2003, Dr. Cohlmia's real estate option expired. [Dkt. # 376 at 13]. In December 2003, President Bush signed into law a statute prohibiting physicians from referring Medicare patients to new speciality hospitals in which the physician had an ownership interest. The statute imposed a moratorium on development of speciality hospitals not already under development. [Dkt. # 376 at 13].

In the summer of 2002, Hillcrest hired Dr. Arshad Yousuf as a staff cardiovascular surgeon to expand its cardiovascular department. From the outset, the relationship between Dr. Cohlmia and Dr. Yousuf was acrimonious. [Dkt. # 376 at 14]. In January 2003, Hillcrest retained an expert to conduct a departmental review of its cardiology unit.[5] At the conclusion of the review, a report was issued that was critical of certain aspects of the unit, including patient selection. The report prompted Hillcrest to institute a moratorium on certain high risk cardiovascular surgical procedures. The moratorium applied to all physicians within the department. Once the moratorium was instituted, Dr. Cohlmia shifted a significant percentage of his practice to St. John. [Dkt. # 376 at 15].

On June 6, 2003, Dr. Cohlmia operated on two lung cancer patients at St. John. [Dkt. # 376 at 17]. Both patients were Native Americans. During the surgery on the first patient, Dr. Cohlmia removed one lung and several ribs, and he collapsed the patient's chest cavity. During the surgery on the second patient, Dr. Cohlmia attempted to remove a tumor in a lung that had invaded the chest wall. The following day, the patients' charts were brought to the attention of Dr. Allred by a nurse at St. John. Dr. Allred reviewed the two patients' charts and monitored their condition for several days. Dr. Allred consulted a number of physician specialists and concluded that Dr. Cohlmia had not followed adequate presurgical protocols for these lung cancer patients.[6] One of the patients died seven days following an attempted corrective surgery, and the other patient

5. Prior to 2004, Hillcrest was in financial distress. [Dkt. # 376 at 8].

6. Dr. Allred talked with several St. John physicians regarding the two subject surgeries performed by Dr. Cohlmia. He spoke to a thoracic surgeon who disagreed with Dr. Cohlmia's decision to operate. The thoracic surgeon said he would not have operated on a patient with cancer in the lung that had spread to the mediastinum and had positive lymph notes. Dr. Allred spoke to Dr. Jay Lohrey, an oncologist, who treated one of the patients post-surgically. Dr. Lohrey felt that Dr. Cohlmia committed error and that his patient had been unnecessarily harmed. A pulmonologist who had reviewed the charts opined that Dr. Cohlmia's pre-surgical work-up was insufficient. [Dkt. # 364 at 3].

was disfigured as a result of the surgery.[7] [Dkt. # 376 at 17]. A meeting to review Dr. Cohlmia's procedures in these two cases was held by St. John's Executive Officers on July 7, 2003. The following day, the officers reached a consensus and summarily suspended Dr. Cohlmia's privileges. [Dkt. # 376 at 17]. Dr. Allred notified Dr. Cohlmia in writing of the summary suspension.[8] Dr. Cohlmia's suspension was reported to the National Practitioner Data Bank as an adverse action. Dr. Cohlmia appealed the summary suspension. In August, a three day hearing was conducted on the suspension in accordance with St. John's bylaws. Retired Federal District Judge Thomas R. Brett served as the hearing officer. Dr. Cohlmia was represented by counsel. [Dkt. # 376 at 17].[9] On September 4, 2003, Judge Brett upheld the suspension. St. John's Executive Committee and Board of Directors reviewed and approved Judge Brett's decision. [Dkt. # 376 at 17].

Upon learning of Dr. Cohlmia's suspension at St. John, Hillcrest required Dr. Cohlmia to conduct and document a comprehensive preoperative patient evaluation and review at its facility. Hillcrest continued to review Dr. Cohlmia's presurgical procedures. Based on the findings in these reviews, in October 2004, Hillcrest sought summary suspension of Dr. Cohlmia's privileges. Dr. Cohlmia objected to Hillcrest's actions and voluntarily suspended his practice until the issue could be resolved. Hillcrest ultimately voted not to renew Dr. Cohlmia's staff privileges. Following Hillcrest's review process, Dr. Cohlmia's medical staff privileges were terminated. [Dkt. # 376 at 19–20].

In early 2004, Dr. Cohlmia did not apply for recredentialing at Saint Francis Hospital, and in early 2005, Dr. Cohlmia withdrew his application for recredentialing at SouthCrest Hospital. [Dkt. # 376 at 19]. In February 2005, Dr. Cohlmia entered into a joint venture to develop a cardiovascular center in Tahlequah, Oklahoma at the Tahlequah City Hospital. Dr. Cohlmia conducts surgeries in Tahlequah and performs certain non-surgical procedures at an office he maintains in Tulsa. [Dkt. # 376 at 20–21].

### *Procedural History*

On July 7, 2005, Dr. Cohlmia filed a 61–page Complaint, containing nine counts, naming more than twenty defendants, asserting claims for violation of Section I and II of the Sherman Antitrust Act, and Section IV of the Clayton

---

7. At the hearing on St. John's motion for summary judgement, a "pre-surgical workup" was explained as diagnostic testing and consulting with other specialists to identify the type of cancerous tumor, the stage of the tumor, and the best method of treatment. [Dkt. # 451 at 12–14]

8. According to St. John's bylaws, Dr. Allred had the authority to summarily suspend any member of the medical staff whenever necessary to "protect the life of any patient(s) or reduce the substantial likelihood of immediate injury or damage to the health or safety of any patient." [Dkt. # 364 at 2]. The letter included the following information: (1) a detailed description of the two cases and the reasons they felt the surgeries were inappropriate; (2) a statement that, based on the advice of members of the medical staff, Dr. Cohlmia's conduct posed an imminent threat of harm to patients; (3) a statement that Dr. Cohlmia had the right to request a hearing to address the summary suspension within 30 days and an identification of the person to whom he should direct the request; and (4) a statement that a hearing would be conducted by a hearing officer appointed by one of the Medical Staff Entities. [Dkt. # 364 at 4].

9. Dr. Cohlmia and St. John were represented by their respective attorneys. Fourteen physicians testified and were cross examined (including Dr. Cohlmia), exhibits were admitted, arguments were made by counsel for both parties and the proceeding was recorded. [Dkt. # 451 at 56].

Antitrust Act, 42 U.S.C. § 1981, Oklahoma Antitrust Reform Act, Tortious Interference with Contract and Prospective Advantage, Defamation, and Intentional Infliction of Emotional Distress. The Complaint sought injunctive relief, monetary damages and attorney fees. At the hearing, the undersigned was advised that Dr. Cohlmia sought $29 million in actual damages, and $90 million in treble and punitive damages. Throughout the course of these proceedings several of the claims and all of the defendants, except St. John, were dismissed for various reasons.[10]

St. John was charged in Count I with Combination and Conspiracy in Restraint of Trade in violation of Section I of the Sherman Act and Section IV of the Clayton Act, in Count III with Conspiracy to Eliminate Market Share in violation of the Oklahoma Antitrust Act, in Count IV with Tortious Interference with Contract and Prospective Advantage, in Count V with Defamation, in Count VI with Denial of Equal Rights in violation of 42 U.S.C. § 1981, and in Count VII with Intentional Infliction of Emotional Distress.[11] [Dkt. # 2]. On September 2, 2005, Dr. Cohlmia filed a First Amended Complaint adding a claim against St. John for Conspiracy to Monopolize the Market in the violation of Section II of the Sherman Act. [Dkt. # 43].[12] On September 29, 2005, St. John filed its first Motion to Dismiss. [Dkt. # 63].

On August 2, 2006, District Judge James Payne entered a 30–page written order addressing St. John's motion to dismiss. As to the Section I violation, plaintiff alleged that St. John abused the peer review process in order to prevent Dr. Cohlmia's development of a speciality heart hospital and to impede his existing medical practice. St. John requested dismissal arguing that the ouster of one physician and the resulting injury to Dr. Cohlmia's practice does not equate to harm to competition, but merely harm to that competitor. Judge Payne agreed with St. John but denied dismissal at "this early stage of litigation because Dr. Cohlmia had alleged facts sufficient to survive dismissal." [13] [Dkt. # 83 at 12].

As to the Section II violation and the corresponding Oklahoma Antitrust Act claim, Dr. Cohlmia alleged that by terminating his medical staff privileges, St. John "posed a dangerous likelihood of success" of obtaining monopoly power over the cardiovascular market. Judge Payne found that Dr. Cohlmia failed to support this conclusory allegation with any facts, and

---

**10.** At the initial attorney fees hearings, Dr. Cohlmia's counsel claimed settlement with co-defendants in this case was evidence that the claims against St. John were reasonable. The undersigned disagrees. Settlement of a case with a co-defendant has no bearing on the merits of St. John's claim for fees. The facts relevant to St. John are not necessarily the same facts relevant to other defendants. Unlike the defendants who settled, judgment on the merits was entered in favor of St. John and against plaintiffs. Moreover, cases, even those with no merit, settle for many reasons, including a desire to minimize legal fees and expenses. The motivations of St. John's co-defendants and the reasons any of the them entered into a settlement with plaintiff have no bearing on this proceeding.

**11.** On August 1, 2005, St. John's lead attorney, Michael Lewis, filed St. John's first pleading in the case, but he neglected to file an entry of appearance. [Dkt. # 10].

**12.** On September 28, 2005, William Spitler and Lesley Richer entered appearances on behalf of St. John. [Dkt. # 59].

**13.** Judge Payne quoted the following authority: "antitrust laws are intended to protect competition, not competitors, and we will not depart from that purpose in order to improve [a doctor's] income standings in the physician league or help him win the Super Bowl of remuneration." [Dkt. # 83 at 12, citing *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991)].

granted dismissal of this claim without prejudice. [Dkt. # 83 at 14].

Judge Payne dismissed with prejudice Dr. Cohlmia's claim for defamation as to any statement made outside the statute of limitation, and dismissed without prejudice all other purported defamation for failing to give St. John notice of the timing of the communication, the parties involved, and the statements deemed actionable. [Dkt. # 83 at 21].

As his civil rights claim, Dr. Cohlmia alleged that St. John's summary suspension was motivated in part by an unlawful desire to deprive Native American patients of cardiothoracic surgical services at St. John, by eliminating Dr. Cohlmia as their preferred physician. Dr. Cohlmia alleged that St. John's actions were motivated by its concern that Dr. Cohlmia's uninsured Native American patients were costing the facility money. Dr. Cohlmia claimed Native Americans were unlawfully discriminated against, were part of a protected class, and were represented by him, their *de facto* representative and advocate of their right to quality health care. [Dkt. # 83 at 21–2]. Judge Payne found "these allegations to be largely unsupported, if not nonsensical." [Dkt. # 83 at 22]. Judge Payne dismissed without prejudice plaintiffs' Section 1981 claim for failure to allege facts to support a *prima facie* case. [Dkt. # 83 at 22]. Judge Payne also granted dismissal of Dr. Cohlmia's claim for intentional infliction of emotional distress, because Dr. Cohlmia failed to allege facts to support the essential elements of the claim. [Dkt. # 83 at 24]. However, Judge Payne granted Dr. Cohlmia leave to amend the Complaint, with a directive to limit the amendment to the deficiencies addressed in the Order. [Dkt. # 83 at 7]. Judge Payne also determined that the peer review process was not privileged under Oklahoma law, as argued by St. John, which opened the door for Dr. Cohlmia to conduct full discovery of St. John's peer review documents, depose personnel at St. John, and determine whether there was any merit to plaintiffs' unsupported allegations. [Dkt. # 83 at 26–7].

On October 10, 2006, Dr. Cohlmia filed a 76–page Second Amended Complaint, joining thirteen additional defendants and alleging additional factual support for all previously pled claims. [Dkt. # 90].[14] On November 9, 2006, St. John filed its second Motion to Dismiss.[15] [Dkt. # 103]. Judge Frizzell conducted a hearing on the second motion to dismiss on May 31, 2007. Judge Frizzell first admonished Dr. Cohlmia's counsel for dragging out the proceeding by exceeding the scope of Judge Payne's order, which was limited to addressing deficiencies.[16] Judge Frizzell denied dismissal of the antitrust claims, reserving them for a summary judgment determination, but he added a cautionary note:

> And there's some serious hurdles that the plaintiffs have to cross here on monopoly. I mean we've got a number of hospitals in this city. So, you know,

**14.** Although Judge Payne had dismissed with prejudice some of plaintiffs' claims, Dr. Cohlmia reasserted all claims pled in his First Amended Complaint.

**15.** In April 2007, the case was transferred to District Judge Gregory Frizzell. [Dkt. # 119].

**16.** Judge Frizzell stated, "I guess the thing that bothers me here if we continue this practice we're going to be sitting here a year from now still addressing the substantive allegations. And I think we need to address that and need to spend some time here this morning as to whether or not you went beyond what Judge Payne allowed you to do. . . . To keep re-pleading it is just begging for this, you know, cadre of lawyers over here to keep you tied up in motions to dismiss at the pleading stage and we're never going to advance the ball." [Dkt. # 125 at 11].

you've got a big hill to climb, frankly, to survive summary judgment.
[Dkt. # 125 at 11]. Judge Frizzell dismissed plaintiff's claims for illegal boycott and defamation, finding there were no facts pled against St. John in those counts. [Dkt. # 125 at 15, 17].

As to plaintiff's re-assertion that St. John's termination of Dr. Cohlmia's medical staff privileges violated Section 1981 by denying Native Americans access to St. John's facility, Judge Frizzell questioned whether the required contract nexus between St. John and Native Americans was pled. Dr. Cohlmia claimed the protected contract right was shown by St. John's refusal to treat Native Americans and requested that Judge Frizzell allow discovery on the issue. [Dkt. # 32]. Judge Frizzell accommodated plaintiff but narrowed discovery to evidence that St. John shut its door on Native Americans. [Dkt. # 125 at 29]. A year and a half later, at the conclusion of discovery, plaintiff dismissed the Section 1981 claim. [Dkt. # 334].

On July 16, 2007, St. John filed an Answer, asserting an affirmative defense of immunity under the Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C. § 11111(a)(1).[17] [Dkt. # 130 at 20]. A scheduling order was entered on March 27, 2008, with discovery cutoff set for November 15, 2008.[18] [Dkt. # 154]. On June 23, 2008, defendants requested four days to conduct Dr. Cohlmia's deposition. [Dkt. # 175]. The motion was granted, dividing the deposition time among defendants. [Dkt. # 181]. By March 2008, defendants had produced over 30,000 documents. This production was increased to 150,000 documents by August 2008. However, Dr. Cohlmia complained that he had not yet received "the most critical information in the case" and that he contemplated receiving thousands of additional documents from St. John. [Dkt. # 205 at 4, 7]. All defendants opposed any extension of the discovery deadline, but on August 20, 2008, Dr. Cohlmia requested, and later received, his first extension of the discovery deadline. [Dkt. # 205].

On August 22, 2008, the reports offered by three of Dr. Cohlmia's expert witnesses were stricken by Magistrate Judge Paul J. Cleary for failure to comply with Rule 26. Judge Cleary concluded that the reports contained mere conclusions without any reasons or basis for the opinions. [Dkt. # 210 at 5]. Judge Cleary rejected Dr. Cohlmia's request to allow up to 30 days before trial to cure the deficiencies. He explained, "A party cannot offer a mere litany of opinions, devoid of rationale, and contend that the report will be 'supplemented' later with the basis and reasons." [Dkt. # 210 at 11]. Judge Clearly rejected plaintiff's alternative request for twenty days to supplement saying the case had been on file for three years and further extensions would increase the cost of litigation for all parties. [Dkt. # 210 at 12]. The order stated:

> The reports of Riddle, Watts and Winslade do not meet the requirements of Rule 26(a)(2). These experts offer opinions, but their reports wholly fail to state the basis and reasons for their conclusions. They fail to set forth the direct testimony they would offer at trial, and provide Defendants no basis for meaningful cross-examination. Even the opinions set forth are often "preliminary" or "expected opinions."

[Dkt. # 210 at 14]. Dr. Cohlmia's appeal of the order was denied by Judge Frizzell.[19] [Dkt. # 262].

---

**17.** On March 3, 2008, James Connor, Jr. and Jason Glass entered appearances on behalf of St. John. [Dkt. # 150, 151].

**18.** On April 7, 2008, Lesley Richer withdrew as counsel for St. John. [Dkt. # 157].

**19.** On September 5, 2008, Hilary Velandia entered an appearance on behalf of St. John. [Dkt. # 225].

On November 7, 2008, St. John filed its first motion for summary judgment. [Dkt. # 279]. On September 21, 2008, Dr. Cohlmia filed a second motion to extend discovery. [Dkt. # 246]. On December 5, 2008, Judge Frizzell reversed a prior decision and once again accommodated plaintiff's request for additional discovery and allowed plaintiff an opportunity to supplement their expert reports. [Dkt. ## 301, 323]. Following the second discovery deadline, on February 12, 2009, Judge Frizzell held a hearing on St. John's motion for summary judgment regarding plaintiff's claim for tortious interference with contract. To support this claim, plaintiff argued that St. John's peer review process was a sham and that St. John's decision to report the adverse action against him to the National Practitioners Base caused Dr. Cohlmia to lose medical staff privileges in Tulsa hospitals and caused the Cherokee Nation, Blue Cross and Blue Shield, and other insurance carriers to question his surgical abilities. [Dkt. # 341 at 87]. To support his claim for tortious interference, Dr. Cohlmia relied heavily on a memo dated June 6, 2003, prepared by Dr. Allred. Plaintiff argued that the memo supported his position that the summary suspension of his privileges was principally motivated by a discriminatory attitude toward Native Americans. [Dkt. # 341 at 25–26]. Dr. Cohlmia also attached copies of his expert reports, but he did not file verifying affidavits.

At the hearing, Judge Frizzell observed that Dr. Cohlmia's briefs failed to comply with the requirements of Rule 56(f), and he declined Dr. Cohlmia's counsel's request for more time to supplement Dr. Cohlmia's pleadings yet again so that they would comport with the rules. [Dkt. # 341 at 87]. As to the merits, Judge Frizzell found that plaintiff failed to show any damages as a result of St. John's peer review process. He also declined to accept plaintiff's novel argument that damages should be presumed upon a suspension of privileges. Instead, Judge Frizzell granted judgment to St. John on plaintiff's tortious interference claim. *Id.* Dr. Cohlmia filed a motion to reconsider and that motion was denied. [Dkt. # 401].

On April 3, 2009, St. John filed a motion for summary judgment seeking immunity on plaintiff's federal and state antitrust claims for restraint of trade and market monopoly. St. John argued that it was entitled to immunity from these claims under HCQIA, because its peer review process was in compliance with the four objective standards set forth therein. 42 U.S.C. § 11112(a).[20] [Dkt. # 363]. On April 7, 2009, St. John participated in a series of joint motions in limine. The first motion sought to exclude Dr. Cohlmia from testifying as to damages, because he failed to provide the nature and amount of damages, and because Dr. Cohlmia had mitigated any loss by his successful joint venture with Tahlequah City Hospital. [Dkt. # 371 at 1–2]. The second motion sought to limit plaintiff's expert witnesses to the content of their expert reports and to exclude any opinion on the legal issue of whether defendants qualified for immunity under HCQIA. [Dkt. # 372]. The third motion sought to exclude Dr. Cohlmia's account of his patients' and colleagues'

---

**20.** Under Section 11112(a), the review must have been taken (1) in the reasonable belief that the action was in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3). *See* 42 U.S.C. § 11112(a)(4).

opinion that defendants conspired to restrain competition and monopolize the market. [Dkt. # 373]. The fourth motion sought to exclude Dr. Cohlmia's testimony on matters outside his personal knowledge. [Dkt. # 374]. The fifth motion sought to exclude Dr. Cohlmia's written summaries of conversations he had with patients and colleagues. [Dkt. # 375]. The sixth motion sought to exclude evidence that St. John's peer review process resulted in the failure of Dr. Cohlmia's specialty heart hospital.[21] [Dkt. # 385].

On April 7, 2009, St. John joined in the other defendants' motion for summary judgment addressing the merits of plaintiff's federal and state antitrust claims. The opening paragraph in the brief states: "Now, after the production of thousands of pages of document, scores of depositions, and the reports and testimony of numerous expert witnesses (including antitrust economists), it is clear that plaintiffs have failed to establish material facts that entitle them to relief under the federal or Oklahoma antitrust laws."[22] [Dkt. # 376 at 1]. On July 31, 2009, Judge Frizzell conducted a hearing on St. John's motions for summary judgment. Both parties presented many of the same factual arguments they made in their motions to dismiss, filed in 2005.

On the immunity issue under HCQIA, St. John focused on: (1) the deposition testimony of physicians and surgeons and excerpts from transcripts of the peer review process show that Dr. Cohlmia's pre-surgical protocol departed from the proper standards of care; (2) St. John suspended Dr. Cohlmia to protect the safety of patients; and (3) St. John's peer review process complied with the requirements of HCQIA. Plaintiffs focused on: (1) the June 26, 2003 memo from Dr. Allred; (2) a comparison of Dr. Cohlmia's Quality Assurance scores with other surgeons; (3) the case of *Brown v. Presbyterian Healthcare Services*;[23] (4) the timing of Dr. Cohlmia's interest in a speciality heart hospital and St. John's termination of his privileges; (5) plaintiffs' expert opinion that St. John's peer review process was "unwarranted, unfair, unreasonable, incomplete, misleading, inaccurate" and even involved false testimony;[24] (6) a St. John official notifying a Hillcrest official that Dr. Cohlmia's privileges at St. John were summarily suspended; (7) the availability of less severe options to address Dr. Cohlmia's pre-surgical protocol; and (8) Dr. Cohlmia's performance of 34 unchallenged surgeries following the two surgeries at issue. [Dkt. # 451 at 3–75].

On the merits of the antitrust claims, St. John argued: (1) plaintiff did not have standing, (2) the Section I claims failed for lack of a showing of concerted action and market power, and (3) the Section II

---

**21.** Judge Frizzell did not address the merits of defendants' motions in limine prior to entering summary judgment in favor of St. John and against Dr. Cohlmia.

**22.** The four years of pretrial proceedings in this case resulted in forty depositions, 250,000 documents produced and over 250 pleadings filed. [Dkt. # 451 at 3]. St John produced, *inter alia*, all of Dr. Cohlmia's peer review and credentialing files; all documents, exhibits and transcripts of Dr. Cohlmia's peer review hearing; ten years of St. John's financial records [Dkt. # 209 at 1]; all peer review and credentialing files for all cardiovascular sur-

geons, interventional radiologists and cardiologists associated with St. John from January 1, 1998 through December 31, 2007; all credentialing and peer review documents and all patient and/or healthcare provider complaints related to Dr. Yousuf; as well as the identification of those with knowledge of the recruitment, interview, credentialing peer review, investigation and/or termination of Dr. Yousuf in his association with St. John. [Dkt. # 300 at 13].

**23.** 101 F.3d 1324 (10th Cir.1996)

**24.** [Dkt. # 451 at 59].

claims failed for lack of showing that St. John posed a "dangerous probability" of achieving market power. Dr. Cohlmia argued that St. John's activity had the following anticompetitive effects: (1) the "diminution of quality" on a patient's choice of surgeons and denial of services to Native Americans, (2) the "retardation of innovation" as speciality heart hospitals are more productive and provide better care, and (3) St. John's sham peer review process. Dr. Cohlmia argued that he was excluded from the market because of: (1) an abusive peer review process which was tantamount to excluding Dr. Cohlmia from the profession as a whole, and (2) his ongoing efforts to secure bank financing and architectural plans for his speciality heart hospital. [Dkt. # 451 at 75–119].

At the conclusion of lengthy arguments, Judge Frizzell granted summary judgment to St. John, finding that it was entitled to immunity under HCQIA. He found that the material facts were not in dispute and that Dr. Cohlmia failed to rebut the presumption of immunity by a preponderance of evidence. Judge Frizzell addressed the significant factual differences supporting the holding in *Brown* and found it distinguishable and not controlling.[25] [Dkt. # 451 at 120–21].

As to the second motion for summary judgment on the merits of Dr. Cohlmia's state and federal antitrust claims, Judge Frizzell found that plaintiff presented "no evidence of antitrust injury." [Dkt. # 451 at 122]. Dr. Cohlmia's loss of privileges at St. John had no impact on market wide prices, or on the quality or quantity of surgical or cardiology services. [Dkt. # 451 at 122]. Judge Frizzell found plaintiff presented "no evidence" of an antitrust injury in fact, because the evidence established that Dr. Cohlmia remained in the marketplace. The time line of events failed to establish that Dr. Cohlmia's interest in developing a specialty heart hospital was causally connected to the termination of privileges at St. John. Dr. Cohlmia is not and was not an appropriate enforcer of the Antitrust Acts, because plaintiffs presented "no connection between the alleged bad act and the alleged antitrust violation in the market." [Dkt. # 451 at 122].

As to alleged concerted action, Judge Frizzell found no violation of Section I of the Sherman Act because plaintiff failed to show a contract or conspiracy between separate entities, and the Act does not reach conduct which is wholly unilateral. [Dkt. # 451 at 123]. Judge Frizzell found that "no reasonable jury could find concerted action with a separate entity or entities here and that plaintiff had not produced the required standard of evidence to show concerted action or conspiracy." [Dkt. # 451 at 123]. Judge Frizzell also found, as to Section I of the Sherman Act, that plaintiff adduced "no evidence of actual anti-competitive effects" attributed to St. John's conduct, "whether in the form of a market wide increase in price, reduction in output or diminution in the quality of any services." [Dkt. # 451 at 124]. Judge Frizzell found that St. John had only 19.3 percent of the relevant market share in 2006, and that a relatively small market share is indicative of a lack of market power.[26] As to Section 2 of the

---

**25.** Specifically, Judge Frizzell said, "The evidence of ulterior motive in *Brown* was direct." In *Brown*, it was clear that an economic competitor had instigated the review and made false misstatements to the National Practitioner Databank, that the doctor was negligent, that the competitor was the principal witness against the plaintiff, and that there was "overwhelming proof of conjuring up evidence against the doctor." In contrast, Judge Frizzell found the evidence of ulterior motive to be merely "inferential." [Dkt. # 451 at 121].

**26.** For authority that St. John's market share was not sufficient to confer market power,

Sherman Act, Judge Frizzell found there was "no evidence other than speculative evidence" that St. John had monopoly power to control prices and to exclude competition. [Dkt. # 451 at 125]. As to the Oklahoma Antitrust Act, Judge Frizzell applied the mandatory provision to construe it consistent with the federal antitrust act. As to the Essential Facilities Doctrine, which is different than the federal antitrust act, Judge Frizzell determined that the doctrine did not apply because of an insufficient number of facilities in the Tulsa market area at the relevant time. Judge Frizzell granted judgment to St. John on the merits of plaintiff's state and federal antitrust claims. [Dkt. # 451 at 125].

### Discussion

HCQIA was enacted to encourage peer review in the medical profession. 42 U.S.C. § 11101(3). The statute protects participants in peer review activities from liability for damages stemming from a review, so long as the review satisfies the standards set forth in Section 11112(a). Persons covered under HCQIA include professional review bodies, members and staff of such a body, any person under a contract or other formal agreement with such a body, and any person who participates with or assists such a body with the peer review process. 42 U.S.C. § 11111(a)(1). A "professional review body" is a health care entity, including its governing body or a committee of the medical staff of the entity which assists the governing body in conducting a professional review activity. 42 U.S.C. § 11151(11). Anyone providing information to the peer review body is also protected. 42 U.S.C. § 11111(a)(2). In the event of litigation, if

immunity is established, HCQIA provides for an award of attorney fees to covered persons for their participation in the peer review process. The attorney fee provision specifically provides:

> In any suit brought against a defendant, to the extent that a defendant has met the standards set forth under section 11112(a) of this title and the defendant substantially prevails, the court shall, at the conclusion of the action, award to a substantially prevailing party defending against any such claim the cost of the suit attributed to such claim, including a reasonable attorney's fee, if the claim, or the claimant's conduct during the litigation of the claim, was frivolous, unreasonable, without foundation, or in bad faith.

42 U.S.C. § 11113. To recover attorney fees under Section 11113, St. John must meet four requirements. First, St. John must show it is a "covered person" as defined in Section 11111. Second, St. John must show it complied with the standards in Section 11112(a) during the review process. Third, St. John must show that it substantially prevailed on plaintiffs' claims. Fourth, St. John must show that Dr. Cohlmia's claims, or conduct during the litigation, were frivolous, unreasonable, without foundation or in bad faith.

 The undersigned first addresses an issue briefed by the parties: whether St. John's entitlement to attorney fees is predicated on the reasonableness of plaintiff's challenge to St. John's affirmative defense of immunity. Put simply, that is not a requirement under Section 11113. The plain language of the statute specifically addresses the reasonableness of plaintiff's *claims*, not the reasonableness of plaintiff's challenge to a defendant's affirmative defense of immunity.[27] Even

---

Judge Frizzell cited and relied on *Jefferson Parish Hospital District No. 2 v. Hyde*, 464 U.S. 808, 104 S.Ct. 58, 78 L.Ed.2d 76 (1983).

**27.** HCQIA, which is designed to protect entities such as St. John from millions of dollars in damages arising out of a properly conducted peer review process, is also designed to protect such entities from needlessly paying

were a court to look beyond the statute's plain language (which is not necessary), the result would be no different. As noted in *Addis v. Holy Cross Health System Corp.*, 88 F.3d 482 (7th Cir.1996), Congress passed HCQIA:

> to provide incentive and protection for physicians engaging in effective professional peer review. 42 U.S.C. § 11101(5). These incentives were designed to encourage doctors to engage in meaningful peer review in light of the Health Care Act's imposition of intensified reporting requirements. It was Congress' hope that doctors would comply with the reporting requirements installed by the Health Care Act and thereby decrease the number of occurrences of medical malpractice.
>
> Important elements of this package of incentives were the creation of statutory immunity for those persons and entities engaged in qualified professional peer review, 42 U.S.C. § 11111(a), 11112(a), and a fee-shifting provision designed *to deter plaintiffs from filing meritless lawsuits* against those persons and entities, 42 U.S.C. § 11113. Thus, 'doctors and hospitals who have acted in accordance with the reasonable belief, due process, and other requirements of the bill are protected from damages sought by a disciplined doctor.'

*Id.* at 485 (emphasis added). In *Addis*, the Court held the text of Section 11113 explicitly provides that an award of fees may be appropriate to the extent a defendant prevailed on the plaintiff's claims, and its professional review process met the standards in Section 11112(a). *Id.* at 486. The Ninth Circuit explained, "[t]he policy behind this provision is clear: Congress wanted to encourage professional peer review by limiting the threat of unreasonable litigation expenses." *Smith v. Ricks*, 31 F.3d 1478, 1487 (9th Cir.1994). Thus, St. smaller amounts to defend itself against un-

John's entitlement to attorney fees is not predicated on whether plaintiffs' challenge to its immunity defense was without foundation. Rather, with respect to step 4, the question is whether Dr. Cohlmia's claims, or his litigation conduct in pursuing those claims, were frivolous, unreasonable, without foundation, or in bad faith.

In reviewing the four requirements, a court may analyze the pleadings, exhibits, procedural history, and orders entered in the case. Clearly, St. John is a "professional review body" as defined in Section 11151(11). Dr. Allred and Dr. Burnett, as staff physicians who participated in the review process, are "covered persons" as defined in Section 11111(a)(2). Judge Frizzell found that Dr. Cohlmia did not rebut the presumption of immunity, thereby concluding that St. John met the standards set forth in Section 11112(a). As shown above, St. John substantially prevailed on all counts pled against it in the Second Amended Complaint. Judge Frizzell's order on summary judgment assists in determining the remaining element, whether Dr. Cohlmia's claims or conduct during the litigation were frivolous, unreasonable, without foundation, or in bad faith. The undersigned does not find that Dr. Cohlmia's "conduct" was frivolous, unreasonable, without foundation or in bad faith. The issue remains whether the "claims" asserted by Dr. Cohlmia were frivolous, unreasonable, without foundation, or brought in bad faith.

Judge Frizzell found that St. John was entitled to immunity, and he rejected Dr. Cohlmia's underlying premise that St. John's peer review process was a sham and served as a subterfuge for St. John to deprive him of state protected property rights, thus allowing St. John to commit torts, antitrust, and civil right violations. Moreover, Judge Frizzell found "no evi-reasonable, unfounded, or frivolous claims.

dence" to support any of Dr. Cohlmia's claims. The undersigned finds that the claims pled against St. John in the Second Amended Complaint were unreasonable when pled, and were clearly shown to be frivolous in the early stages of the litigation.

St. John conducted a thorough, open, and professional peer review in compliance with its bylaws. Over fourteen physicians testified, documents were exchanged, exhibits offered, the entire proceeding was recorded and transcribed, Dr. Cohlmia was represented by counsel, and the proceeding was held before a retired federal district judge, Thomas Brett. Judge Brett issued a detailed written opinion which was reviewed and approved by St John's Executive Committee and St. John's Board of Trustees. On the other hand, in commencing this action, Dr. Cohlmia made unreasonable accusations that St. John's peer review process was a sham and conducted in bad faith.[28] Thereafter, Dr. Cohlmia tried to show that St. John used its peer review process to run him "out of town" and, purportedly, to "deprive Native Americans of quality health care." Dr. Cohlmia engaged in costly and fruitless discovery, sought unreasonable continuations of discovery deadlines, unreasonably requested leave to conform pleadings to the rules, and even sought an unreasonable last minute supplement hoping to add substance to otherwise conclusory reports from expert witnesses. Judge Frizzell found that plaintiff produced "no evidence" suggesting that St. John was involved in a conspiracy or concerted effort to restrain trade and "no evidence" that St. John had sufficient market share to have even a potential for market power. Judge Frizzell warned Dr. Cohlmia early on that St. John was one of many hospitals in Tulsa

and that he had some serious hurdles to cross in establishing antitrust liability. Ignoring indicators that his case against St. John lacked substance, Dr. Cohlmia plowed ahead seeking additional discovery and disregarding the mounting costs of litigation.

Dr. Cohlmia's claim against St. John for defamation fell outside the statute of limitations. Early in the proceeding, Judge Payne characterized the allegations supporting Dr. Cohlmia's Section 1981 claim as "largely unsupported, if not nonsensical." At the pleading stage, Judge Payne dismissed with prejudice plaintiff's claim for intentional infliction of emotional distress. Judge Frizzell granted St. John summary judgment on plaintiff's claim for tortious interference with contract. Finally, Judge Frizzell not only found that St. John was entitled to immunity, which of itself would have ended this litigation, but he went on to find there was no evidence to support Dr. Cohlmia's antitrust allegations.

At the hearing before the undersigned, Dr. Cohlmia argued that his claims were not unreasonable or frivolous, because the peer review process was tainted with irregularities. Plaintiff argued that no cardiovasular surgeon was asked to review the two surgeries in question. However, in *Brown*, the case plaintiff relies on, the Tenth Circuit was critical of the fact that a competitor of Dr. Brown's testified against her. The use of a cardiovascular surgeon in this case likely would have been a direct competitor of Dr. Cohlmia. In any event, Judge Frizzell found no such taint. Dr. Cohlmia relied on the June 26, 2003 memo prepared by Dr. Allred as proof that Dr. Cohlmia's summary suspension had "nothing to do with patient care" but was moti-

---

**28.** St. John's professional peer review process preceded the professional peer review process conducted by Hillcrest Medical Center.

vated by a desire to eliminate the treatment of Native Americans at St. John's surgical facilities. Judge Frizzell rejected this argument. The undersigned also finds no merit to plaintiff's contention that the June 26 memo establishes that plaintiff's case was reasonably filed. The memorandum, which was obtained in discovery, by its very language, supports St. John's claim that it summarily suspended Dr. Cohlmia out of concern for patient care, because: (1) Dr. Cohlmia failed to follow proper pre-surgical protocol, and (2) Dr. Cohlmia had three times the mortality rate compared to other cardiovascular surgeons. In the memo, Dr. Allred expresses concern that Dr. Cohlmia was operating on patients:

> without any other consultation. He only gets consultations afterwards when it is appropriate or necessary for the patient. I reassured Dr. De Leon that I am aware of this being a significant problem and that we will monitor closely. It is very difficult to remove someone from the staff once they have full privileges. He has been on the staff since 1985, being brought in by Dr. Loughridge, hailed as a 'superb addition to the CV staff.' Unfortunately this has not proved to be correct. I've talked to Dr. Raines about this and they are aware that his mortality rate is three times the mortality rate of the rest of the group. They average 2–3% with his being 9.8 range. This is indeed intolerable.

[Dkt. # 414, Ex. 7].

Dr. Cohlmia claims his reliance on the facts of *Brown* shows his case was reasonable. However, as Judge Frizzell pointed out, the facts in *Brown* are distinguishable. Dr. Brown's case involved a direct financial competitor assisting in submitting a *false* report to the National Practitioner Data Bank stating that Dr. Brown had been found by the hospital to be negligent, incompetent, and guilty of malpractice. After Dr. Brown notified the Data Bank

that the report was false, the hospital was notified and given an opportunity to amend the data bank report, which it declined to do. At no time had the review panel or the hospital Board of Trustees found that Dr. Brown was negligent, incompetent, or guilty of malpractice. Also, Dr. Brown sufficiently established damages caused by the interference with her attempt to hire an associate to join her practice. *Id.* at 1327–8, 1330–1334. In this instance, St. John accurately reported the findings made by Judge Brett, as confirmed by the hospital administration, and Dr. Cohlmia transitioned to a successful relationship with a hospital in Tahlequah. Dr. Cohlmia failed to show any intentionally false statements and resulting damage.

Dr. Cohlmia also argued his claims were reasonable because St. John failed to consult with him prior to his summary suspension. However, St. John had no legal duty to consult with Dr. Cohlmia. His counsel reluctantly admitted this fact, but argued it would be a fairer practice for St. John to do so. Plaintiff further argued that its case was reasonable because Quality Assurance ("QA") reviewed the two cases which gave rise to Dr. Cohlmia's suspension. One case was assigned a four which means "practice unacceptable and potential harm to patient" and the other was given a three which is "variance from the usual standard of care and represents opportunity to improve care." Dr. Cohlmia argued that there were several other physicians with poorer ratings whose medical privileges were not terminated. This argument has no merit. *See, e.g., Smith v. Ricks,* 31 F.3d 1478 (9th Cir.1994). In *Smith,* Dr. Smith, a cardiologist, filed suit after the defendant hospital terminated his medical staff privileges because of poor judgment and inadequate treatment. Dr. Smith sought damages under the Sherman Antitrust Act, contending the hospital and physicians used the peer review process to

monopolize the market and to conspire against him to restrain trade. Dr. Smith's only challenge to the hospital's investigation was that he was not permitted to discover or introduce evidence regarding the conduct of other doctors. The court stated: "Dr. Smith essentially claims he was not the worst doctor at Good Samaritan. However, nothing in the statute, legislative history, or case law suggests the competency of other doctors is relevant in evaluating whether Good Samaritan conducted a reasonable investigation into Dr. Smith's conduct." *Id.* at 1486. The undersigned finds this reasoning to be sound and applicable here.

As to his claim that St. John and Hillcrest conspired to terminate his privileges, Dr. Cohlmia argued that the claim was reasonable because of his outspoken criticism of Dr. Yousuf.[29] This argument fails as well. Dr. Cohlmia was provided a full due process hearing at St. John thus providing him a fair forum to assert this claim. No subterfuge is shown by the proceeding or by the hearing examiner, Judge Brett. Other arguments made by plaintiff at the hearing were equally without merit.

Plaintiff claimed that the shear volume of discovery and pleadings filed in the case are evidence his claims were reasonable. This argument is meaningless in light of the generous scope of discovery permitted in this case, with an end result that plaintiff presented "no evidence" to support his claims. Plaintiff argued that Judge Frizzell's statement complimenting counsel on their performance during the litigation is indicative that plaintiff's case was reasonable.[30] This argument also lacks merit.

Zealous representation of a client can occur even if a claim is frivolous, unreasonable, or lacks foundation.

For the foregoing reasons, the undersigned finds that Dr. Cohlmia's claims were unreasonable and without foundation at the onset of the case, as discovery developed, and ultimately through the granting of judgment on the merits four years later.

### Reasonable Attorney Fees

In its motion for attorney fees filed on August 31, 2009, St. John requested fees and expenses in the amount of $973,601.25 under HCQIA on the basis that Dr. Cohlmia's challenge to St. John's HCQIA defense was without foundation and unreasonable. In the alternative, St. John sought attorney fees under HCQIA on the basis that Dr. Cohlmia's tortious interference and state and federal antitrust claims were without foundation and unreasonable. [Dkt. # 458 at 2, 9]. In its supplemental brief filed on December 17, 2010, St. John reserved the right to argue for an award of attorney fees on all claims brought by Dr. Cohlmia and in asserting its affirmative defense of HCQIA immunity. [Dkt. # 518 at 2].

By affidavit, Michael Lewis attests that he and his law firm Doerner, Saunders, Daniel & Anderson served as lead counsel for St. John. [Dkt. # 458, Ex. 1, Att. 1]. Mr. Lewis states his law firm maintained daily chronological time sheets with summaries of the legal services it rendered. Doerner, Saunders, Daniel & Anderson seeks $765,824.00 in fees and expenses which it billed to St. John. *Id.* By affidavit, James Connor, Jr. attests that he and his

**29.** This argument fails at the attorney fee stage of the proceeding, because plaintiff is essentially attempting to relitigate the issue of immunity which was resolved by Judge Frizzell.

**30.** Judge Frizzell made the following statement immediately prior to announcing his decision granting judgment to St. John: "First, I'd like to say that the advocacy on both sides here has been just extraordinarily good and I appreciate it very much from all of you." [Dkt. # 529, Ex. C].

law firm Richards & Connor were hired by St. John in this case. [Dkt. # 458, Ex. 2, Att. 1]. Mr. Connor states that his law firm maintained daily chronological time sheets with summaries of legal services rendered. Richards & Connor seeks $207,777.50 in fees and expenses which it billed to St. John. The two law firms seek attorney fees for the combined work of 22 lawyers, 6 paralegals, and 4 summer clerks. Of the 22 lawyers representing St John, two served as trial lawyers and lead counsel, four served as healthcare lawyers, one served as an employment lawyer, eight served as general litigation lawyers, three served as complex litigation lawyers, one as a trial lawyer, one as an appellate lawyer, one as a land use lawyer, and one as a lawyer specializing in Native American law. [Dkt. # 518, Ex. A]. Doerner, Saunders, Daniel & Anderson filed a 177–page billing statement and Richard & Connor filed an 87–page billing statement. The undersigned has reviewed, in detail, each of these statements.

Dr. Cohlmia opposes St. John's motion for attorney fees arguing that his claims were not frivolous or unreasonable. Alternatively, Dr. Cohlmia challenges the attorney fees and expenses on general grounds of excessive billing and duplication of effort.

▉▉ Both parties assert that factors set forth in *Burk v. City of Oklahoma City*, 598 P.2d 659, 661 (Okla.1970) should be considered in determining the reasonableness of the amount of fees requested. Under *Burk*, a court is to consider the hourly rate times the number of hours reasonably spent to determine a lodestar of the fee determination, and a court may increase or decrease fees by considering certain enumerated factors. *See also Mor-*

*gan v. Galilean Health Enterprises, Inc.*, 977 P.2d 357, 364 (Okla.1998). Those factors include time and labor required; novelty and difficulty of the questions presented; skill requisite to perform the legal service properly; the preclusion of other employment caused by accepting the case; the customary fee; whether the fee is fixed or contingent; time limitations; the amount involved and the results obtained; the undesirability of the case; the nature and length of the professional relationship; and awards in similar cases. *Id.* at 661–62.

Dr. Cohlmia's counsel advised that except for the hourly rate attributed to certain paralegal work, Dr. Cohlmia does not contest the hourly rate charged by the attorneys for St. John.[31] Rather, Dr. Cohlmia enumerated specific objections to the amount of time sought in St. John's fee request. The undersigned will first address those objections.

▉ Dr. Cohlmia challenges the reasonableness of billing full hourly rates for travel time, a sum of $13,000.00. The undesigned agrees, but only because St. John failed to show that these fees were reasonably incurred or necessary. Dr. Cohlmia challenges the reasonableness of assessing fees for St. John's challenge to plaintiff's motion to compel. Plaintiff assigns $20,750.00 for this activity. The undersigned agrees, because St. John continued to pursue a peer review privilege after the issue was determined by Judge Payne.

▉ Dr. Cohlmia challenges approximately $17,126.00 in billings for paralegal time in coding at an hourly rate of $95.00, claiming $50.00 per hour is reasonable. The undersigned agrees that coding is not necessarily a legal skill and the amount requested will be reduced by $8,563.00.[32] Dr. Cohlmia challenges the

---

**31.** Except as set forth below, the undersigned finds that the hourly rates charged by St. John's counsel, including paralegals, was reasonable.

**32.** There is, however, no requirement for the court to identify each hour reasonably expended by each timekeeper, nor is there any requirement that the court announce what

reasonableness of $4,700.00 in billings for preparation of a joint defense agreement. The undersigned finds the amount unreasonable, however the defense agreement resulted in some cost savings in attorney fees for duplicated work. The undersigned will reduce that amount by $2,700.00. Dr. Cohlmia challenges the duplication in work performed by attorneys with Doerner, Saunders, Daniel & Anderson and those with Richards & Connor. Mr. Lewis' firm was hired to defend the antitrust claims, and Mr. Connor's firm was hired for its expertise in cardiothoracic medicine. Dr. Cohlmia does not assign a dollar value to this objection, accordingly its denied. In addition, the undersigned finds the allocation of work between the two firms to be reasonable.

██ Dr. Cohlmia objects to duplicate billings for communications between attorneys in the same law firm, in house emails, in-house conferences and conferences with co-counsel and for activities not traditionally associated with legal work. Dr. Cohlmia asserts that 20 percent of the billings are for these activities. The undersigned disagrees that billing for inter-office communications and communications with co-counsel is necessarily unreasonable. Such communications are often necessary and can lead to efficiencies in the distribution and provision of legal services. Nonetheless, such fees are subject to abuse and should be supported by specific explanations or more detailed time sheets allowing a ready determination of the benefit of such communications in each instance. Such support was not always present here. In addition, the undersigned finds merit in Dr. Cohlmia's argument that some of the billed time was for activities not traditionally associated with legal work. Thus, the amount claimed has been reduced by an

additional 10 percent. A sum of $97,360.13.

██ Dr. Cohlmia objects to the $2,400.00 claimed for the work of summer clerks. The undersigned disagrees that billing for the work of summer clerks is necessarily unreasonable. Summer clerks can, sometimes, provide quality legal work at an hourly rate that is far less than a client would pay if the work were performed by an attorney. Such work, however, is generally not performed as efficiently as it would be by an attorney and must be more strictly scrutinized by a supervising attorney. It is difficult, with the information supplied, to determine whether such scrutiny actually occurred here. The undersigned finds that 50% of the time claimed for work of summer clerks is reasonable and, thus, will reduce this amount by one-half, or $1,200.00.

Dr. Cohlmia objects that three of St. John's attorneys separately billed their full hourly rate for attending a full day of depositions of Dr. Allred, Dr. Cohlmia, and Dr. Landgartner. In a case of this size that involves at least three highly specialized areas (thoracic surgery, HCQIA, and antitrust), it is not presumptively unreasonable to have three attorneys present at critical depositions. Moreover, plaintiff did not furnish the undersigned with a dollar value for this objection, accordingly, and in light of the affidavits supplied by St. John's counsel, it is denied. Dr. Cohlmia further claims that attorney fees should be excluded for any deposition not used or cited in preparation of St. John's motions for summary judgement. The undersigned rejects the notion that only the cost of discovery which was used to support a successful dispositive motion is recoverable, particularly since plaintiff fails to show

hours are permitted for each legal task. *See Case v. Unified School District No. 233,* 157

F.3d 1243 (10th Cir.1998).

that the subject depositions were unnecessary and places no dollar value on this objection.

 Dr. Cohlmia objects to attorney fees claimed for defending against plaintiff's antitrust claims, arguing that St. John adopted the briefs filed by Womble, Carlyle, Sandridge & Rice, a law firm in North Carolina, specifically attorney Mark Horoscak, whose expertise is antitrust law. However, adopting the briefs of Mr. Horoscak likely saved St. John, and now plaintiff, substantial attorney fees. In addition, the fact that Mr. Horoscak prepared the briefing did not reduce the obligation of St. John's counsel to be informed of, and to participate in, its potential defenses to the antitrust claims, particularly since St. John was the sole remaining defendant at the time of the summary judgment hearing before Judge Frizzell. Knowledge of the content of these briefs was essential in preparing for the hearing. The undersigned denies this objection.

 Dr. Cohlmia also challenges the "exorbitant number of timekeepers, use of block and/or indecipherable billing entries," and the excessive and unrealistic number of hours claimed. [Dkt. # 529 at 27–28]. Dr. Cohlmia does not assign a dollar value to these objections. In response, St. John asserts that 90.3 percent of the legal work performed by Doerner, Saunders, Daniel & Anderson was performed by Mr. Lewis as lead counsel; Hilary Velandia as a healthcare lawyer; Marilyn Schooling as lead paralegal and William Spitler for general litigation. The undersigned finds some validity to Dr. Cohlmia's objection. Accordingly, to accommodate this objection, the undersigned will reduce the fees requested by 10 percent to eliminate fees not attributed to principal timekeepers and block billing, a reduction of $97,360.13. Those objections which fail to specify a dollar value are denied for lack of sufficient evidence (again, in light of St. John's counsel's affidavits).

Finally, the undersigned RECOMMENDS that St. John's request for leave to file supplemental attorney fees in its pursuit of an attorney fee award be denied. Based on the undersigned's detailed review of the time records presented, consideration of the *Burk* factors, and review of the entire docket, the recommended fee award reflects a reasonable fee for the services provided by St. John's counsel in this litigation, taking into account its efforts on the pending motion.

### Recommendation

In consideration of the objection filed and supported by Dr. Cohlmia, the undersigned **RECOMMENDS** that St. John be awarded $732,668.00 in attorney fees as prevailing party in this action pursuit to 42 U.S.C. § 11113.

### Objection

In accordance with 28 U.S.C. § 636(b) a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by February 3, 2012.

If specific written objections are timely filed, Fed.R.Civ.P. 72(b) directs the district judge to:

> determine *de novo* any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

Fed.R.Civ.P. 72(b); *see also* 28 U.S.C. § 636(b)(1).

The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations

waives appellate review of factual and legal questions." *United States v. One Parcel of Real Property,* 73 F.3d 1057, 1059 (10th Cir.1996) (quoting *Moore v. United States,* 950 F.2d 656, 659 (10th Cir.1991)). Only a timely specific objection will preserve an issue for de novo review by the district court or for appellate review.